954 So.2d 505 (2007)
ST. DOMINIC-JACKSON MEMORIAL HOSPITAL, Appellant
v.
MISSISSIPPI STATE DEPARTMENT OF HEALTH and Madison HMA, Inc. d/b/a Madison Regional Medical Center, Appellees.
No. 2006-SA-00281-COA.
Court of Appeals of Mississippi.
April 17, 2007.
*507 Jonathan R. Werne, Edmund L. Brunini, Jr., Jackson, attorneys for appellant.
Andy Lowry, Allison C. Simpson, Thomas L. Kirkland, Jr., Ridgeland, Donald E. Eicher, III, Flowood, attorneys for appellees.
Before LEE, P.J., ISHEE and ROBERTS, JJ.
LEE, P.J., for the Court.

FACTS AND PROCEDURAL HISTORY
¶ 1. On December 9, 2004, Madison HMA, Inc., d/b/a Madison County Medical Center (MCMC), filed a certificate of need (CON) application to relocate and replace its entire sixty-seven bed hospital in Canton, Mississippi, to a location off Interstate 55 on the Nissan Parkway (a distance of less than five miles). Madison HMA is a wholly owned subsidiary of Health Management Associates, Inc. (HMA). In its application, Madison HMA sought to completely replace its current 59,930 square foot facility built in 1965 with a 122,000 square foot facility in a more accessible location. The capital expenditure for the project is estimated at $42,133,956. St. Dominic contested the application, asserting that the CON did not meet the criteria set out in the State Health Plan. Further, St. Dominic argues that the project proposed by HMA is not a relocation and replacement but a much bigger project designed to stifle competition in Madison County.
¶ 2. Unlike other recent applications for relocation that were determined to be expansions, Madison HMA is seeking a true relocation. No services will be duplicated. It will move its entire hospital to the Nissan Parkway and close the current location. Since this is a relocation, the criteria under which the State Health Department correctly reviewed the application is that for "Construction, Renovation, Expansion, Capital Improvement, Replacement of Health Care Facilities, and Addition of Hospital Beds." This section requires documentation of need by, but not limited to, showing licensure and code deficiencies, long-term plans, recommendations of consulting firms, deficiencies cited by accreditation agencies, and, if there is an expansion of emergency facilities, a statement concerning whether the hospital will participate in the statewide trauma system.
¶ 3. After reviewing the application under the above criteria, the State Health *508 Department's staff concluded that the application was in compliance with the State Health Plan. St. Dominic requested a hearing which was held June 14-16, 2005. At the hearing each party was afforded the opportunity to present evidence and testimony to support its position. Eight witnesses testified and forty-four exhibits were entered into evidence during the three-day hearing. At the conclusion of the hearing, the hearing officer recommended that the application be approved, and, on October 27, 2005, the State Health Officer concurred with the hearing officer's recommendation and issued the CON. St. Dominic then appealed the decision to the Chancery Court of the First Judicial District of Hinds County. On January 30, 2006, the chancellor affirmed the decision of the State Health Officer granting the CON.
¶ 4. St. Dominic now appeals to this Court the chancellor's affirmance of the final order of the Mississippi State Department of Health granting a CON to Madison HMA. St. Dominic cites the following issues on appeal: (1) was the Department's decision to grant the CON on the proposed project supported by substantial evidence; (2) did the application satisfy the applicable specific criteria in the State Health Plan; (3) did the application substantially comply with the applicable general review criteria; (4) was the application in compliance with the four general goals of the State Health Plan; and (5) was there a need for relocation or were the goals of the State Health Plan, specifically that of cost containment, better served by renovation and/or rebuilding at the current location. The five issues cited by St. Dominic are closely related and can be addressed collectively. The only issue to be decided by this Court is whether the Department's decision was based on substantial evidence. To avoid repetition of facts and issues, all the issues will be discussed under Issue I.
¶ 5. Finding the Department's decision supported by substantial evidence, we affirm.

STANDARD OF REVIEW
¶ 6. Judicial review of the State Health Officer's CON order is limited by Mississippi Code Annotated Section 41-7-201(2)(f) (Rev.2005) which provides, in part:
The order shall not be vacated or set aside, either in whole or in part, except for errors of law, unless the court finds that the order of the State Department of Health is not supported by substantial evidence, is contrary to the manifest weight of the evidence, is in excess of the statutory authority or jurisdiction of the State Department of Health, or violates any vested constitutional rights of any party involved in the appeal.
¶ 7. This Court assigns great deference to decisions of administrative agencies. Delta Reg'l Med. Ctr. v. Miss. State Dep't of Health, 759 So.2d 1174, 1176(¶ 12) (Miss.1999) (citing Melody Manor Convalescent Ctr. v. Miss. State Dep't of Health, 546 So.2d 972, 974 (Miss.1989)). There is a rebuttable presumption in favor of the decision rendered by an agency and the burden of proving to the contrary is on the challenging party. His Way Homes, Inc. v. Miss. Gaming Comm'n, 733 So.2d 764, 767(¶ 9) (Miss.1999). Neither this Court nor the chancery court can "substitute its judgment for that of the agency or reweigh the facts of the case." Id. at (¶ 10). To be reversed on appeal, an administrative agency's decision must be demonstrated to be arbitrary and capricious and not based on substantial evidence. Id. at (¶ 9); Cain v. Miss. State Dep't of Health, 666 So.2d 506, 510 (Miss.1995).

*509 DISCUSSION
I. WAS THE DEPARTMENT'S DECISION TO GRANT THE CON ON THE PROPOSED PROJECT SUPPORTED BY SUBSTANTIAL EVIDENCE
Four Goals of the State Health Plan
¶ 8. Mississippi's health planning and health regulatory activities have the following purposes: (1) to prevent unnecessary duplication of health resources; (2) to provide cost containment; (3) to improve the health of Mississippi residents; and (4) to increase the accessibility, acceptability, continuity, and quality of health services. 2005 State Health Plan. While all of the stated purposes are important, cost containment and the prevention of unnecessary duplication of health resources are given primary emphasis in the CON process. Id.
¶ 9. The Department determined that Madison HMA does not seek to duplicate any services, thus meeting the first goal of the State Health Plan. MCMC's existing facilities and services will be completely relocated to the Nissan Parkway, and the current facility will be closed. As to the second goal, the Department found sufficient cost containment. According to the testimony at the hearing, no substantial financial impact on Medicare would occur. Only a minor increase in Medicaid may occur, but it was not enough to warrant opposition by Medicaid to the application. No public funds will be used in the construction of the new facility since HMA is a private, tax-paying entity and is thus providing all the funding for the project. Madison County will receive the benefits of a modern hospital without spending city or county money, and the City of Canton may ultimately see an increase in tax revenue from the upgraded, more attractive facility. St. Dominic argues that since the proposed project costs more than remodeling the old facility, replacement does not sufficiently promote cost containment. However, St. Dominic offered no witnesses at the hearing to testify as to the best measure of cost containment nor did it provide convincing evidence through cross-examination of HMA's witnesses. After hearing the evidence, the Department agreed with HMA that renovation would be almost as costly as replacement and would be inefficient and ineffective. We find that the Department had substantial evidence to determine the extra costs were necessary because the new facility will provide more comprehensive health services.
¶ 10. As to the third and fourth factors, the Department determined that the replacement facility will enable physicians to do a better job and allow more patients to be treated in a more modern and acceptable facility. Overwhelming evidence was presented at the hearing about the poor condition of MCMC's current facility. For example, a MCMC physician testified that the patient rooms are extremely small and cramped if the doctor, patient, and caretaker are all in the room. Also, the restrooms and other facilities are not compliant with the Americans with Disabilities Act. Another physician testified that medical care would be more effective if he could keep more patients at MCMC instead of transferring them to other hospitals. The primary reason given for transfers is lack of facilities and lack of services provided by other disciplines. If a renovation is undertaken, the current hospital would be effectively closed during the renovation leaving Madison County without hospital services. In addition, the new facility will use eight of the sixty-seven beds currently in use to establish an intensive care unit to better serve the needs of patients.
¶ 11. As for accessibility, MCMC is currently difficult to access for most patients. *510 From most routes, the current location on Highway 16 requires traveling through downtown Canton through stop lights and over railroad tracks. While just five miles from the current facility, the new location will be more convenient for the residents of Madison County and the people in and north of Canton as it will be located just off Interstate 55. There are several ways to reach the proposed location. Patients on Interstate 55 north or south can take exit 118, and patients coming from Canton can take Highway 22 or Highway 21 which intersects with the Nissan Parkway. Also, Canton has proposed building a road from Highway 51 to Highway 43 which meets right at the Nissan Parkway, and Nissan plans to build a road from Highway 22 to Nissan Drive. Seventy-five percent of the population in MCMC's primary and secondary service areas will have the same or less drive time to the new facility.
¶ 12. Another important criteria to be considered is indigent care. MCMC treats all residents in the area, particularly low income, racial and ethnic minorities, women, handicapped persons, elderly and others. The Department found that the replacement facility will continue to serve these patients, and it will better serve handicapped patients as it will be ADA compliant. With additional space and a more attractive facility, new physicians can be recruited to offer different specialities. Also, the Department found that the new facility will be more easily accessible to these groups and for those with emergencies to find the hospital. William Truly, a family physician at MCMC, testified that Medicare and Medicaid patients, the majority of his practice, "ought to have an accessibility and availability to the best of care, particularly as it relates to a higher level of care, as it relates to speciality care." After reviewing the testimony, we find that substantial evidence existed for the Department to conclude that MCMC's CON application met the four goals of the State Health Plan.
The CON Application
¶ 13. St. Dominic lists four "problems" in the CON application that it argues should have led the Department's staff to find that the project was not supported by substantial evidence. St. Dominic alleges that the Department recognized the problems from the beginning, and the problems were not corrected or explained in the hearing. We will address each of the alleged problems separately.
¶ 14. First, St. Dominic alleges that the planned capital expenditure on the new hospital facility is excessive when compared with other recent replacement projects and that no justification was given in the application for the excessive cost. The staff analysis compared the MCMC application with two recent hospital replacement projects in Mississippi-Lackey Memorial Hospital in Forest and Newton Regional Hospital in Newton. The Lackey facility was approved in June 2004 and the Newton facility was approved in February 2003. However, the Department concluded that these two projects were smaller, provided different services, and differed in ownership since MCMC is owned by a private corporation. For example, Lackey Hospital's application was for a smaller critical access hospital which did not have all of the services of a general medical and surgical hospital like MCMC. Also, the Department determined that other factors not considered in the Lackey or Newton applications must be taken into consideration when calculating the costs of the new MCMC facility. The Department found that extra costs associated with electrical services, natural gas services, phones, access roads, and drainage systems would be required for the new facility. Also, the soil at the new location contains Yazoo *511 clay, a common problem in the area, which will require a special foundation. Jackie McGowan, vice-president of facilities, management and planning for River Oaks Health System and construction projection coordinator for HMA, testified that there were no unusual numbers in the cost estimate. From the testimony presented at the hearing, the hearing officer could not find that the costs associated with the project were unreasonable under the circumstances. We find that substantial evidence existed to support the hearing officer's findings.
¶ 15. The second alleged "problem" is Rachel Pittman's testimony that the Department could not verify that the financial projections were accurate, and, thus, the financial feasibility of the project could be at issue. A project is financially feasible if the applicant can withstand a loss and become profitable by its second or third year of operation. The Department determined that Madison HMA met this criteria. St. Dominic argues that the Department's staff noted that MCMC had not identified any method of projection regarding the financial aspects of the project. Pittman is the chief of the division of Health Planning and Resource Development for the Department. She testified to having reviewed hundreds of CON applications in her twenty years at the Department. Pittman testified that not only did her division review the financial projections, but the projections were also reviewed by the Department's accounting division. The financial projections were found acceptable by both reviewing parties. While Pittman admitted that the methodology of the projections was not expressly stated, we find that the Department was still able to support its findings with substantial evidence. As the hearing officer found, "projections are just that-projections or forecasts of what may happen in the future based on certain facts that are assumed." The hearing officer went on to state that "[t]here was no persuasive evidence offered to show that the projections are flawed. They appear on the face to be reasonable under the circumstances." St. Dominic offered nothing to support its proposition that the financial projections were inaccurate at the hearing. We cannot find the Department's decision was against the manifest weight of the evidence without any evidence to the contrary.
¶ 16. Third, St. Dominic argues that relocation of Hill-Burton facilities is not recognized as a necessary remedy to aging facilities built under the Hill-Burton program. It also asserts that Pittman performed no independent investigation into the applicant's assertion that MCMC could not renovate or expand at its present location. We do not dispute that relocation of Hill-Burton facilities may not be a "necessary remedy" in all situations. MCMC presented a valid argument for relocation. MCMC is located on less than nine acres, was built in 1965 under the Hill-Burton program, and has not been renovated except for the addition of an emergency room. St. Dominic's president, Claude Harbarger, acknowledged the need for replacement or, at the very least, a substantial renovation of MCMC's facility. The hearing officer found that it would be "highly impractical to demolish MCMC and build a new state-of-the-art hospital on the eight to nine (8-9) acres of available land." The hearing officer had substantial evidence to justify his ruling. During the time of construction, patients in the Madison County area would be left without a nearby hospital. Given that the hospital would be effectively closed, physicians may choose to move their practices to facilities elsewhere during the renovation. In his own testimony, Harbarger stated that if *512 there was going to be one hospital in Madison County, the Nissan Parkway was an "appropriate" location. The hearing officer found that Harbarger's testimony further illustrated the appropriateness of the location.
¶ 17. Fourth, St. Dominic argues that Pittman acknowledged that Madison HMA did not consider renovation or replacement of MCMC at the current location. It argues that specific criterion 1.a. of the State Health Plan requires that the applicant show a "need" for replacement and that no need exists because renovation can be done at the current location. St. Dominic argues that the current Canton facility could be renovated for less than half of the cost of the proposed project. One basis for this argument is an architectural and engineering study done in 2002 which estimated the cost of renovation to be between $15 and $20 million-less than half of the cost of the current proposed replacement. We find no basis for reliance on this study. Even St. Dominic apparently did not rely on this study since its own estimate of renovation cost for MCMC was over $32 million. The study St. Dominic refers to was based on renovating MCMC into a twenty-two bed critical access hospital. Neil Booth, an electrical engineer with eight years experience in the health care industry, assisted in drafting the 2002 study. At the CON application hearing, Booth denied that the 2002 report addressed the entire facility. He stated, "We've not written a report that analyzes what it would take or cost to take care of the entire facility. We've never been asked to do that." We find that the hearing officer correctly chose not to rely on this study but rather to based his decision on the evidence as a whole.
¶ 18. As to the allegation that Madison HMA did not consider renovation, Madison HMA presented several reason why renovation was not practical. For example, renovation would be limited because of land constraints. St. Dominic acknowledges this argument but asserts that it is not valid because the land around the current facility is owned by Madison County and HMA should have approached the county about acquiring the land. We find no authority for St. Dominic's argument that Madison HMA had a duty to first attempt to purchase adjacent land. Joseph Weaver, Chief Executive Officer of MCMC, testified that the adjacent land was not available, and the hearing officer chose to accept his testimony. Regardless, a large nursing home is located behind MCMC's present facility, and, even if it could purchase the county owned land, it would own basically two lots separated by the nursing home. Further, renovating does not solve the problem of the current facility being in a poor location. The hearing officer noted that "[p]art of St. Dominic's opposition to HMA building a hospital on the Nissan Parkway appears to be based on St. Dominic's belief that St. Dominic possessed a CON for constructing a brand new hospital at St. Catherine's Village." While St. Dominic's CON for this hospital was initially granted, the Hinds County Chancery Court overturned the grant of the CON and the supreme court affirmed. St. Dominic-Madison County Med. Ctr. v. Madison County Med. Ctr., 928 So.2d 822 (Miss.2006). Previously denied CON applications made by St. Dominic are irrelevant to whether or not Madison HMA's CON was properly granted.
¶ 19. To continue with St. Dominic's fourth alleged problem  that renovation was not considered as an option  we find that Madison HMA presented ample evidence that the current facility is too outdated to be brought up to current standards. St. Dominic asserts that none of HMA's witnesses had any construction, architectural, *513 or engineering expertise nor could testify that significant savings would not result from renovation of the present location. Having read the transcript of the hearing proceedings, we cannot agree that witnesses for MCMC were not experts in their fields. Several witnesses' qualifications have already been discussed, and this Court takes no issue with their qualifications. For example, Noel Falls testified that he had been in the health care industry for thirty-three years and had been in private practice doing market research and regulatory assistance for twenty-five years. Falls also testified that he had written over 500 CON applications and had testified over 250 times as an expert in the areas of health planning, health market research, and the CON process. In his testimony, Falls stated that when MCMC was built the focus was on inpatient procedures. Seventy to eighty percent of surgeries in modern hospitals are outpatient, and according to Falls's testimony "one of the limitations now with the current facility is it has essentially no space to stage outpatient care." Harbarger confirmed this change in his testimony that there had been a shift between inpatient and outpatient services, and St. Dominic has made changes to accommodate its patients by recently constructing a new outpatient center.
¶ 20. Dale Carr, previous department division director of fire safety in construction at the Department, was in charge of ensuring compliance with all codes and standards for renovations and construction of healthcare facilities, including the State Minimum Standards of Operation of Hospitals in Mississippi. He testified that these minimum standards were not in effect forty years ago when MCMC was built. The only reason MCMC is in compliance with state regulations is because it was grandfathered in. If MCMC were to undertake a major renovation at its current facility, then it would have to comply with the minimum standards, the ADA, the Health Insurance Portability and Accountability Act (HIPAA), and all other current applicable standards. The reason for these regulations should also be given weight: the regulations are in place to provide quality healthcare in a safe environment. Further, Carr testified that it would be a "nightmare to go under a Joint Commission review" for accreditation by the Joint Commission on Accreditation of Healthcare Organizations (JCAHO).
¶ 21. Jackie McGowan, vice-president of facilities, management, and planning at River Oaks Health Systems and construction project coordinator for HMA, testified that it would not be practical to build on the current site for many reasons. For example, he testified that the limited space at MCMC's current facility would cause problems with parking, the hospital would have to be planned around access roads which are required for the nursing home behind the facility, construction would have to be done around a main electrical transition line that runs to a substation at the edge of the property, and water lines would have to be replaced to ensure proper water pressure to a larger facility. McGowan further testified that bringing the current facility up to code with a renovation would be difficult. He stated that "if you're going to expend a large amount of money into an existing facility, it would be  it would just be easier to build a new one, and start there." McGowan, as well as other witnesses, testified that the current patient rooms are too small and the only way to expand them would be to tear down the outer walls which are needed for structural support. Even if the outer walls were left in place and one and a half old rooms were to be combined into one, the structural support columns are aligned in such a manner that combining rooms *514 would leave the columns inside the patients' rooms.
Conclusion
¶ 22. We find, even in light of the "problems" pointed out by St. Dominic, the Department's decision was based on substantial evidence. We agree with the chancellor that at the hearing and in its application Madison HMA sufficiently demonstrated the deficiencies in its current location and its reasons for needing a new facility. In addition to demonstrating the current hospital's deficiencies discussed in this opinion, as well as countless others brought out at the hearing but not discussed herein, Madison HMA provided evidence of its long-term plans and the recommendations of consulting firms regarding the appropriateness of the relocation.
¶ 23. The issues discussed in this opinion represent only a fraction of the reasons given at the hearing why replacement would be a better option than renovation. For example, some of the deficiencies not discussed in this opinion but that were brought out at the hearing include space constraints in the waiting area, ineffective ambulance entrance, inability to accommodate necessary equipment in the operating rooms, undersized patient rooms, shared patient showers, undersized trauma room, water damage, a lack of sprinklers, and the possible existence of asbestos. We find that the Department's decision that the current location has exceeded its useful life is not against the manifest weight of the evidence nor was its decision that relocation was appropriate arbitrary or capricious.
¶ 24. We find that the Department and the hearing officer had an overwhelming amount of evidence to find that renovation was not practical. St. Dominic's failure to produce any substantial evidence supporting its opposition to the CON application further supports the finding that Madison HMA's project should be approved.
¶ 25. THE JUDGMENT OF THE HINDS COUNTY CHANCERY COURT IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
KING, C.J., MYERS, P.J., IRVING, CHANDLER, BARNES, ISHEE AND ROBERTS, JJ., CONCUR. GRIFFIS AND CARLTON, JJ., NOT PARTICIPATING.