LEE, P.J.,
 

 for the Court.
 

 PROCEDURAL HISTORY
 

 ¶ 1. In December 2006, Mid-South Associates, LLC (Mid-South) filed a certificate of need (CON) with the Mississippi State Department of Health (MSDH) seeking to relocate seventy-five nursing home beds from Bolivar Health and Rehabilitation Center (BHRC) in Bolivar County to De-Soto County. MSDH staff recommended that the application be denied, finding that the project failed to substantially comply with the overall objectives of the 2007 State Health Plan and the Mississippi Certificate of Need Review Manual, 2006 Revision. Mid-South then requested a hearing
 
 *360
 
 on the matter. The City of Cleveland (the City), where BHRC is located, entered an appearance as an interested party and participated in the hearing. We will refer to MSDH and the City collectively as “MSDH” unless specifically noted.
 

 ¶ 2. A hearing was held in June 2007. The hearing officer adopted the findings and conclusion submitted by both MSDH and the City and denied Mid-South’s application. The State Health Officer (SHO) adopted the MSDH staff analysis and the findings of the hearing officer and issued his final order disapproving the CON. Mid-South appealed this decision to the DeSoto County Chancery Court. The chancellor set aside the decision by the SHO and authorized the relocation of the seventy-five beds to DeSoto County.
 

 ¶ 3. MSDH and the City now appeal, asserting two issues: (1) the chancellor did not follow the correct standard of review, and (2) the rejection of Mid-South’s application was supported by substantial evidence. Finding reversible error in regard to MSDH’s second issue, we decline to review issue one. We will relate pertinent facts as needed in our discussion.
 

 STANDARD OF REVIEW
 

 ¶ 4. Judicial review of the SHO’s CON order is limited by Mississippi Code Annotated section 41-7-201 (2)(f) (Rev.2005) which provides, in part:
 

 The order shall not be vacated or set aside, either in whole or in part, except for errors of law, unless the court finds that the order of the State Department of Health is not supported by substantial evidence, is contrary to the manifest weight of the evidence, is in excess of the statutory authority or jurisdiction of the State Department of Health, or violates any vested constitutional rights of any party involved in the appeal.
 

 ¶ 5. This Court assigns great deference to decisions of administrative agencies.
 
 Delta Reg’l Med. Ctr. v. Miss. State Dep’t of Health,
 
 759 So.2d 1174, 1176(¶ 12) (Miss.1999) (citing
 
 Melody Manor Convalescent Ctr. v. Miss. State Dep’t of Health,
 
 546 So.2d 972, 974 (Miss.1989)). There is a rebuttable presumption in favor of the decision rendered by an agency, and the burden of proving the contrary is on the challenging party.
 
 His Way Homes, Inc. v. Miss. Gaming Comm’n,
 
 733 So.2d 764, 767(¶ 9) (Miss.1999). Neither this Court nor the chancery court can “substitute its judgment for that of the agency or reweigh the facts of the case.”
 
 Id.
 
 at (¶ 10). To be reversed on appeal, an administrative agency’s decision must be demonstrated to be arbitrary and capricious and not based on substantial evidence.
 
 Id.
 
 at 766(¶ 9);
 
 Cain v. Miss. State Dep’t of Health,
 
 666 So.2d 506, 510 (Miss.1995).
 

 DISCUSSION
 

 ¶ 6. Mississippi Code Annotated section 41-7-193(1) (Rev.2005) states, in pertinent part, that:
 

 A certificate of need shall not be granted or issued to any person for any proposal, cause or reason, unless the proposal has been reviewed for consistency with the specifications and the criteria established by the State Department of Health and substantially complies with the projection of need as reported in the state health plan in effect at the time the application for the proposal was submitted.
 

 Mississippi’s health planning and health regulatory activities have the following purposes: (1) to prevent unnecessary duplication of healthcare resources; (2) to provide cost containment; (3) to improve the health of Mississippi residents; and (4) to increase the accessibility, acceptability, continuity, and quality of healthcare ser
 
 *361
 
 vices. 2007 State Health Plan. While all of the stated purposes are important, cost containment and the prevention of unnecessary duplication of health resources are given primary emphasis in the CON process.
 
 Id.
 
 The plan also states that the MSDH “intends to disapprove CON applications which fail to confirm that the applicant shall provide a reasonable amount of indigent care, or if the applicant’s admission policies deny or discourage access to care by indigent patients.”
 
 Id.
 

 ¶ 7. In the hearing officer’s recommendation to deny the CON, which was ultimately adopted by the SHO, the hearing officer found that the relocation of the nursing home would create an unnecessary duplication of health resources. The hearing officer found it unnecessary to build a new facility for the same beds absent a showing of need. The hearing officer further determined that the project failed to meet the applicable need criterion as discussed in detail below. Sam Dawkins, Director of the Office of Health Policy and Planning for the MSDH, testified that the purpose of the plan is not to move beds from one county to another every time one area of the state grows more than the other.
 

 ¶ 8. In regard to cost containment, the hearing officer relied upon the testimony of John Hyde, the City’s expert in healthcare planning. Hyde testified that the project would have a negative impact on cost containment and actually cause healthcare costs to increase. Hyde stated that the same services in DeSoto County were likely to cost more than those provided in Bolivar County. There was testimony that the new facility intended to reduce its Medicaid utilization rates from approximately 62% to approximately 33%. However, Dawkins testified that cost containment includes healthcare costs for private pay, insurance pay, and Medicare, not just Medicaid.
 

 ¶ 9. The hearing officer stated that there was no testimony either at the hearing or information in the CON application regarding the third objective of improving the health of Mississippi residents. Hyde testified that the relocation would negatively affect the healthcare environment in Bolivar County, an economically depressed and medically underserved area. The hearing officer noted the similarity between the fourth objective, increasing accessibility, acceptability, continuity, and quality of healthcare services, and the third objective and found the testimony supporting these objectives to be inadequate as well. It was noted in the staff analysis that although DeSoto County had a need for the beds, the relocation would “create a void in Bolivar County, a medically underserved area. Residents will either be relocated 105 miles from their families or will be forced to seek [health]care elsewhere.” In their testimonies, Dawkins and Hyde each agreed with the finding in the staff analysis. John Mayo, a Mississippi State representative for District 25, which includes a portion of DeSoto County, testified that those living in rural areas need an easily accessible facility. Representative Mayo stated that in areas with a high poverty rate and elderly population, it is important for the well-being of the patients that they be near their families.
 

 ¶ 10. In addition to the need to conform to the State Health Plan, the 2006 Certificate of Need Review Manual lists several criteria to be used by the MSDH for evaluation of projects. General Consideration 100.01(1) states that “[a] project may be denied if the Department determines that the project does not sufficiently meet one or more of the criteria.” Although the staff analysis reviewed the CON applica
 
 *362
 
 tion in regard to all the criteria, the staff analysis specifically found that Mid-South’s application failed to comply with General Review Criterion 5 entitled “Need for the Project.” The hearing officer also found that Criterion 5 was the most relevant to the application, specifically sections 5(a), (b), and (e). These particular sections are stated as follows:
 

 a. The need that the population served or to be served has for the services proposed to be offered or expanded and the extent to which all residents of the area — in particular low income persons, racial and ethnic minorities, women, handicapped persons and other under-served groups, and the elderly — are likely to have access to those services. b. In the case of the relocation of a facility or service, the need that the population presently served has for the service, the extent to which that need will be met adequately by the proposed relocation or by alternative arrangements, and the effect of the relocation of the service on the ability of low income persons, racial and ethnic minorities, women, handicapped persons and other underserved groups, and the elderly, to obtain needed health care.
 

 [[Image here]]
 

 e. The community reaction to the facility will be considered. The applicant may choose to submit endorsements from community officials and individuals expressing their reaction to the proposal. If significant opposition to the proposal is expressed in writing or at a public hearing, the opposition may be considered an adverse factor and weighed against endorsements received.
 

 ¶ 11. Mid-South’s argument primarily focuses on the 2007 State Health Plan’s indication that DeSoto County needs 567 additional beds while Bolivar County has 92 more beds than it needs. However, the staff analysis and the hearing officer found that there was substantial evidence to show Bolivar County’s need to keep the seventy-five beds.
 

 ¶ 12. In regard to section (a), Jean Beard, an expert for Mid-South, testified that when the MSDH considers a relocation it must consider the population “presently served.” Beard testified that although Bolivar County was determined by the federal government to be a “medically underserved area” (MUA) in 1984, DeSoto County was also determined to be one in 1978. However, Hyde testified that using the formula to calculate present averages, DeSoto County would have an average score of 79.9, placing it out of the MUA designated range of scores below 62. Hyde also testified that the MSDH’s own rankings of counties by the general health of their residents places Bolivar County at number fifty out of eighty-two and DeSoto County at number one, with one being the healthiest.
 

 1Í13. The staff analysis noted that BHRC’s occupancy rate in 2005 was 75.75%. Sherry Davis, the administrator at BHRC, testified that, at the time of the hearing, the facility was 84% occupied. The staff analysis also noted that the occupancy rate in the four other facilities in Bolivar County ranged from 83% to 99%. There was testimony that Bolivar Medical Center’s nursing home was at 97-100% capacity with a waiting list. There was concern that any vacant beds in the area would be filled by BHRC’s patients, creating a waiting list for other patients. The staff analysis stated that although Bolivar County’s population was projected to slightly decrease by 2010, the population of persons over the age of sixty-five was projected to increase. The staff analysis stated that “[wjhile this is a small increase, it does signify that there is a continued need for nursing home beds in the county.”
 

 
 *363
 
 ¶ 14. Hyde testified that the poverty level of Bolivar County has a tremendous impact on determining need. Hyde stated that at-risk, elderly, minority, handicapped, and low-income people typically do not seek or receive preventative care. Dawkins testified that the lack of healthcare access in the region stems from the lack of medical personnel, characteristics of the population, demographics, and payor sources. Dawkins further testified that Bolivar County’s citizens would be harmed by removing these beds. Dawkins also stated that Mid-South plans to decrease its Medicaid utilization rate from 62% to 33% and to decrease its indigent and uncompensated care from 9% to 3%. Mid-South also plans to increase its private pay customers from 0% to 18% and its Medicare-utilization rate from 29% to 46%. Dawkins and Hyde agreed that the reasons for Mid-South’s relocation were primarily financial.
 

 ¶ 15. In regard to section (b), Mid-South presented testimony regarding De-Soto County’s population growth and the need for the seventy-five beds. The May- or of Hernando, Chip Johnson, testified as to the area’s population increase. However, Representative Mayo admitted in his testimony that most of the population increase was due to young families moving to the area. Mid-South assumes that all current residents at BHRC can be absorbed into the surrounding facilities with no material impact on the available medical resources. The hearing officer found that Mid-South failed to take into consideration a resident’s or family member’s preference for one nursing home over another. An owner of two Bolivar County nursing homes testified through deposition that his two facilities could absorb any BHRC patients who chose not to relocate. However, both of his facilities had been cited at one time for various deficiencies.
 

 ¶ 16. Mid-South also relies on the fact that there are sixty available beds at Shelby Nursing and Rehabilitation Center, located in Bolivar County. However, these beds had been placed in abeyance or not licensed to provide services, and there was no testimony that Shelby Nursing would attempt to have the beds re-licensed at any point in the future. Both Hyde and Beard projected a need for beds in Bolivar County in the next few years. Dawkins also testified that an increase in the population needing nursing home beds in Bolivar County would create a future need for additional beds in Bolivar County. The staff analysis and the hearing officer noted that in light of the moratorium on building new nursing home facilities, no new beds can be added to Bolivar County.
 

 ¶ 17. Another one of Mid-South’s proposals for “alternative arrangements” consisted of relocating BHRC’s residents to DeSoto County. Judy Ullery, president of Joy Health and Covenant Dove, the company managing BHRC, testified that it was BHRC’s intention to cease admissions while the new facility was being built. Ul-lery stated that by the time the new facility was completed, the resident population will have been reduced such that only a few residents would need to relocate. However, Dr. Steven Clark, BHRC’s physician and medical director of Bolivar Medical Center’s nursing home, testified that transferring patients even for a short amount of time results in the deterioration of their health. Dr. Clark stated that the “geriatric population doesn’t respond well to changes in environment, particularly if they’ve been cared for in an environment for a long period of time.” Dawkins, Hyde, and John Lindsey — the Chief Administrative Officer for the City of Cleveland — each testified that losing healthcare facilities, especially in an economically depressed area, negatively affects the economy in the area in which it served, either by
 
 *364
 
 losing qualified personnel or losing healthcare dollars to other towns in the area.
 

 ¶ 18. Willie Lee Simmons, Senator for District 13, which includes Bolivar County, testified that the relocation of the beds would have a devastating effect on Bolivar County, namely because of the difficulty low-income persons have in obtaining needed healthcare. Senator Simmons testified that it is difficult and sometimes impossible for low-income persons to make regular visits to nursing homes.
 

 ¶ 19. The hearing officer noted that Bolivar Medical Center, the county hospital, opposed the relocation. The hearing officer found that decreasing the number of available beds in Bolivar County would directly impact the hospital’s ability to provide services. With fewer nursing-home beds to move patients into, the hospital would be required to keep its patients in acute-care beds longer than-is necessary, both harming the financial viability of the hospital and the healthcare of patients in need of acute care.
 

 ¶ 20. In regard to section (e), there were testimony and evidence demonstrating significant opposition to the relocation of the beds. The City, the local hospital, and local residents voiced their opposition to the relocation. The City passed an official resolution opposing the project. Staff of BHRC and family members of residents testified in opposition to the relocation. At the time of the staff analysis, over 200 letters of opposition had been written by the residents of Bolivar County. Ultimately, the MSDH received over one thousand additional letters opposing the relocation. There were no letters from Bolivar County residents supporting the relocation. Mid-South questioned the authenticity of the letters, especially the Grenada postmark, but David Work, the May- or of Cleveland, clarified that letters mailed from Cleveland are processed through Grenada before being delivered. Mayor Work also testified that the City offered Mid-South eight acres of land adjacent to BHRC, but Mid-South declined the offer. At the time of the staff analysis, eleven letters had been received in support of the relocation from residents of DeSoto County. The hearing officer found that there was “significant opposition” to the relocation and weighed that opposition against the CON approval.
 

 ¶ 21. We find substantial evidence in the record to support the hearing officer’s finding that the relocation project was not consistent with the State Health Plan. There was substantial evidence shown that the relocation of the nursing home beds “would have a significant adverse [ajffect on the ability of an existing facility or service to provide indigent care.” 2007 State Health Plan. We also find that the MSDH did not act arbitrarily or capriciously, outside its authority, or violate any vested constitutional rights. We reverse the chancellor’s judgment granting the CON and render judgment to reinstate the MSDH’s decision to deny the CON.
 

 ¶ 22. THE JUDGMENT OF THE DE-SOTO COUNTY CHANCERY COURT IS REVERSED AND RENDERED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLEE.
 

 KING, C.J., MYERS, P.J., IRVING, GRIFFIS, BARNES, ISHEE, ROBERTS AND MAXWELL, JJ., CONCUR. CARLTON, J„ NOT PARTICIPATING.