**IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI**

**NO. 2013-SA-00790-COA**

| | |
|---|---|
| **SINGING RIVER HEALTH SYSTEM,** | **APPELLANTS** |
| **CONSISTING OF SINGING RIVER HOSPITAL** | |
| **AND OCEAN SPRINGS HOSPITAL;** | |
| **MEMORIAL HOSPITAL AT GULFPORT, AND** | |
| **GARDEN PARK MEDICAL CENTER** | |

**v.**

| | |
|---|---|
| **MISSISSIPPI STATE DEPARTMENT OF** | **APPELLEES** |
| **HEALTH AND HARRISON HMA, LLC, D/B/A** | |
| **GULF COAST MEDICAL CENTER** | |

| | |
|---|---|
| DATE OF JUDGMENT: | 04/15/2013 |
| TRIAL JUDGE: | HON. PATRICIA D. WISE |
| COURT FROM WHICH APPEALED: | HINDS COUNTY CHANCERY COURT |
| ATTORNEYS FOR APPELLANTS: | BARRY K. COCKRELL |
| | BETTY TOON COLLINS |
| | ELIZABETH G. HOOPER |
| ATTORNEYS FOR APPELLEES: | BEATRYCE MCCROSKY TOLSDORF |
| | THOMAS L. KIRKLAND JR. |
| | ROBERT EMMETT FAGAN JR. |
| | ANDY LOWRY |
| | ALLISON CARTER SIMPSON |
| NATURE OF THE CASE: | CIVIL - STATE BOARDS AND AGENCIES |
| TRIAL COURT DISPOSITION: | AFFIRMED AGENCY'S DECISION |
| | GRANTING CERTIFICATE OF NEED |
| DISPOSITION: | AFFIRMED AND REMANDED - 11/18/2014 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE IRVING, P.J., MAXWELL AND JAMES, JJ.**

**IRVING, P.J., FOR THE COURT:**

¶1. Singing River Health System, consisting of Singing River Hospital and Ocean Springs

Hospital; Memorial Hospital at Gulfport, and Garden Park Medical Center (collectively the Gulf Coast Hospitals) appeal from the judgment of the Hinds County Chancery Court affirming the order of the Mississippi State Department of Health (DOH) granting a Certificate of Need (CON) to Harrison HMA LLC d/b/a Gulf Coast Medical Center (hereinafter HMA, unless the context dictates otherwise). The Gulf Coast Hospitals argue that the chancery court erred in affirming the order of the DOH because the DOH failed to comply with Mississippi law in granting the CON to HMA.

¶2. Finding no reversible error, we affirm the judgment of the Hinds County Chancery Court and remand this case for a determination of the amount of attorney's fees to be awarded to HMA.

## FACTS

¶3. Gulf Coast Medical Center (GCMC), a hospital in Biloxi, Mississippi, was licensed for 144 beds. In 2008, GCMC closed down, but HMA placed the beds in abeyance in a de-licensed status, pursuant to Mississippi Code Annotated section 41-7-191(1)(c) (Rev. 2013). At that time, HMA placed a sign on the facility stating that GCMC would reopen in a new location. Three years later, HMA filed a CON application for the replacement and relocation of GCMC. HMA asked to spend $133,322,098 to construct a 144-bed hospital off of Interstate 10 in Biloxi to be named "The Hospital at Cedar Lake" (the Project). After a hearing, the DOH granted the CON. The Gulf Coast Hospitals appealed to the Hinds County Chancery Court, which upheld the grant of the CON, leading to this appeal.

## DISCUSSION

2

¶4. A strict standard governs judicial review of the DOH's final order granting or denying a CON. Mississippi Code Annotated section 41-7-201(2)(f) (Rev. 2013) sets forth the applicable standard of review:

> The order shall not be vacated or set aside, either in whole or in part, except for errors of law, unless the court finds that the order of the State Department of Health is not supported by substantial evidence, is contrary to the manifest weight of the evidence, is in excess of the statutory authority or jurisdiction of the State Department of Health, or violates any vested constitutional rights of any party involved in the appeal . . . .

"The decision of the hearing officer and [the] State Health Officer is afforded great deference upon judicial review by [appellate courts], even though [appellate courts] review the decision of the chancellor." *St. Dominic-Jackson Mem'l Hosp. v. Miss. State Dep't of Health*, 728 So. 2d 81, 83 (¶9) (Miss. 1998) (quoting *Miss. State Dep't of Health v. SW. Miss. Reg'l Med. Ctr.*, 580 So. 2d 1238, 1240 (Miss. 1991)). "[An appellate court] will neither reweigh the evidence nor conduct a de novo review of contested facts. Rather, [the appellate] review is limited to whether substantial evidence existed to support the DOH's decision." *Id.* ¶5.

In this case, HMA requested a CON to build a new facility in a new location, about four miles north of its old facility, with the same number of beds that had been de-licensed when GCMC ceased operations in the old facility. The Gulf Coast Hospitals admit that HMA possessed beds in a de-licensed status and that GCMC was not closed for sixty months. However, because HMA was not seeking to reopen its old facility in its original building at its same location, the Gulf Coast Hospitals contend that the DOH was required to evaluate HMA's CON application as if GCMC never existed. In other words, the Gulf Coast

3

Hospitals' position is that GCMC was no longer an existing hospital and could not be treated as such in the CON process. More specifically, the Gulf Coast Hospitals in essence contend that DOH was required to analyze the need component for the project as if GCMC was establishing a new hospital, not replacing or relocating an existing hospital. As support for their argument, the Gulf Coast Hospitals point to the fact that HMA had sold the physical structure that once contained the beds. As we explain later, we reject the contention that GCMC was not an existing hospital at the time of HMA's CON application and, therefore, could not be considered—for purposes of the CON process—a relocation of an existing hospital.

¶6.    Additionally, the Gulf Coast Hospitals contend that the DOH did not review HMA's CON application for compliance with the general review considerations of the State Health Plan, specifically general review criteria numbers 3, 5, including its sub-parts, and 8. We also disagree with this contention. We discuss later in this opinion the DOH's consideration of general review criteria numbers 3, 5, and 8, which are the review criteria that the Gulf Coast Hospitals claim were not considered by the DOH, leading to the Gulf Coast Hospitals' ultimate contention that the evidence is insufficient to support the DOH's finding that the CON should be granted. We have attached, as an appendix, the hearing officer's findings of fact, conclusions of law, and recommendation, that clearly show the DOH considered general review criteria numbers 3, 5, and 8, as well as considered HMA's application consistent with the applicable statutory law, the State Health Plan, and relevant case law.

¶7.    We disagree as well with the Gulf Coast Hospitals' lack-of-substantial-evidence

4

contention and point out that the hearing officer, in her findings of fact, addressed each contention now made by the Gulf Coast Hospitals. Admittedly, the evidence was conflicting, as all parties presented expert testimony supporting their point of view. But at the end of the day, it was the prerogative of the DOH, as the fact-finder, to determine the credibility of the witnesses. Viewed from this perspective, there is substantial evidence supporting the decision of the DOH.

¶8. Finally, before we delve further into our discussion, we should point out that we reject the Gulf Coast Hospitals' further contention that only the DOH's staff findings can be considered in this appeal because the State Health Officer did not incorporate the findings of the hearing officer in her order granting the CON. We quote the relevant portion of the State Health Officer's order:

> This proposal came before the State Health Officer on this the 20th day of December 2012, for culmination of review and determination.
>
> STAFF FINDINGS: The project is in substantial compliance with the State Health Plan and General Review Criteria found in the Certificate of Need Review Manual.
>
> STAFF RECOMMENDATION: Approval
>
> HEARING OFFICER RECOMMENDATION: Approval
>
> THE STATE HEALTH OFFICER FINDS: Concurs with and adopts staff's findings and recommendation.
>
> DECISION OF INTENT
>
> *It is the intent of the State Health Officer, after considering* the Department's plans, standards and criteria; staff's analysis; *hearing officer's recommendation, if any, and making written findings,* that the proposed be

5

approved.

So ordered this the 20th day of December 2012.

(Emphasis added). The Gulf Coast Hospitals suggest that it is protocol for the State Health Officer to "adopt" the findings of the hearing officer. While the State Health Officer did not state in the order that she adopted the findings of the hearing officer, it is clear to us that her order granting the CON was based on the findings of the hearing officer, as well as on the recommendation of the staff based on its analysis because she approved both of them.

    *I.      Controlling Statutory Law*

¶9. In Mississippi, the DOH is charged with reviewing applications for a CON. Mississippi Code Annotated section 41-7-191 (Rev. 2013) states in pertinent part:

> (1) No person shall engage in any of the following activities without obtaining the required certificate of need:

> (a) The construction, development or other establishment of a new health care facility, *which establishment shall include the reopening of a health care facility that has ceased to operate for a period of sixty (60) months or more;*

>                         * * * *

> (c) Any change in the existing bed complement of any health care facility through the addition or conversion of any beds or the alteration, modernizing or refurbishing of any unit or department in which the beds may be located; however, if a health care facility has voluntarily delicensed some of its existing bed complement, it may later *relicense* some or all of its delicensed beds without the necessity of having to acquire a certificate of need. The State Department of Health shall maintain a record of the delicensing health care facility and its voluntarily delicensed beds and continue counting those beds as part of the state's total bed count for health care planning purposes. If a health care facility that has voluntarily delicensed some of its beds later desires to relicense some or all of its voluntarily delicensed beds, it shall notify the State Department of Health of its intent to increase the number of its licensed

6

beds. The State Department of Health shall survey the health care facility within thirty (30) days of that notice and, if appropriate, issue the health care facility a new license reflecting the new contingent of beds. However, in no event may a health care facility that has voluntarily delicensed some of its beds be reissued a license to operate beds in excess of its bed count before the voluntary delicensure of some of its beds without seeking certificate of need approval;

* * * *

(m) Reopening a health care facility that has ceased to operate for a period of sixty (60) months or more, which reopening requires a certificate of need for the establishment of a new health care facility.

(Emphasis added).

## II. State Health Plan

¶10. All parties agree that the statutory mandate is effectuated through the State Health Plan, which "establishes standards and criteria for granting a CON in compliance with [s]ection 41-7-191." *See* Miss. Code Ann. § 41-7-173(s) (Rev. 2013). Additionally, all parties agree that section 102.03 of the State Health Plan applies to consideration of HMA's CON application for the Project. Because the Project will cost more than $2,000,000, section 102.03 requires the DOH to evaluate the need for the Project under the *general criteria* for the establishment of new facilities, as well as under the *specific criteria* for the relocation of facilities when no acute care beds are being added, such as the case here. The relevant portion of section 102.03 provides:

**Certificate of Need Criteria and Standard for Construction, Renovation, Expansion, Capital Improvements, Replacement of Health Care Facilities, and Addition of Hospital Beds**

The Mississippi State Department of Health (MSDH) will review applications

7

for Certificate of Need for the addition of beds to a health care facility and projects for construction, relocation, expansion, or capital improvements involving a capital expenditure in excess of $2,000,000 under the applicable statutory requirements of Sections 41-7-173, 41-7-191 and 41-7-193, Mississippi Code of 1972, as amended. The MSDH will also review applications for Certificate of Need according to the general criteria listed in the Mississippi Certificate of Need Review Manual; all adopted rules, procedures, and plans of the MSDH; and the specific criteria and standards listed below.

* * * *

**3. Need Criterion:**

> **a. Projects which do not involve the addition of any acute care beds**: The applicant shall document the need for the proposed project. Documentation may consist of, but is not limited to, citing of licensure or regulatory code deficiencies, institutional long term plans (duly adopted by the governing board), recommendations made by consultant firms and deficiencies cited by accreditation agencies (JCAHO, CAP, etc.). In addition, for projects which involve construction, renovation, or expansion of emergency department facilities the applicant shall include a statement indicating whether the hospital will participate in the statewide trauma system and describe the level of participation, if any.

¶11.    The general review considerations are set forth in chapter 8, section 100.01 of the Certificate of Need Manual. Section 100.01 sets forth sixteen general review criteria. We quote the relevant portions of the section:

**CHAPTER 8 - CRITERIA USED BY STATE DEPARTMENT OF HEALTH FOR EVALUATION OF PROJECTS**

100    **General Considerations**

100.01                    Projects will be reviewed by the Department as deemed appropriate. Review, evaluation, and determination of whether a CON is to be issued or denied will be based

8

upon the following general considerations and any service specific criteria which are applicable to the project under consideration.

1.    **State Health Plan**: The relationship of the health services being reviewed to the applicable State Health Plan.

> NOTE:    CON applications will be reviewed under the State Health Plan that is in effect at the time the application is received by the Department.
>
> No project may be approved unless it is consistent with the State Health Plan.  A project may be denied if the Department determines that the project does not sufficiently meet one or more of the criteria.

2.    **Long Range Plan**: The relationship of services reviewed to the long range development plan, if any, of the institution providing or proposing the services.

3.    **Availability of Alternatives**: The availability of less costly or more effective alternative methods of providing the service to be offered, expanded or relocated.

4.    **Economic Viability**: The immediate and long-term financial feasibility of the proposal, as well as the probable effect of the proposal on the costs and charges for providing health services by the institution or service. Projections should be reasonable and based upon generally accepted accounting procedures.

   a.    The proposed charges should be comparable to those charges established by other facilities for similar services within the service area or state. The applicant should document how the proposed charges were calculated.

   b.    The projected levels of utilization should be reasonably consistent with those experienced by similar facilities in the service area and/or state. In addition, projected levels of utilization should be consistent with the need level of the service area.

9

c. If the capital expenditure of the proposed project is $2,000,000 or more, the applicant must submit a financial feasibility study prepared by an accountant, CPA, or the facility's financial officer. The study must include the financial analyst's opinion of the ability of the facility to undertake the obligation and the probable effect of the expenditure on present and future operating costs. In addition, the report must be signed by the preparer.

5. **Need for the Project**: One or more of the following items may be considered in determining whether a need for the project exists:

a. The need that the population served or to be served has for the services proposed to be offered or expanded and the extent to which all residents of the area – in particular low income persons, racial and ethnic minorities, women, handicapped persons and other underserved groups, and the elderly – are likely to have access to those services.

b. In the case of the relocation of a facility or service, the need that the population presently served has for the service, the extent to which that need will be met adequately by the proposed relocation or by alternative arrangements, and the effect of the relocation of the service on the ability of low income persons, racial and ethnic minorities, women, handicapped persons and other underserved groups, and the elderly, to obtain needed health care.

c. The current and projected utilization of like facilities or services within the proposed service area will be considered in determining the need for additional facilities or services. Unless clearly shown otherwise, data where available from the Division of Health Planning and Resource Development shall be considered to be the most reliable data available.

d. The probable effect of the proposed facility or service on existing facilities providing similar services to those

proposed will be considered. When the service area of the proposed facility or service overlaps the service area of an existing facility or service, then the effect on the existing facility or service may be considered. The applicant or interested party must clearly present the methodologies and assumptions upon which any proposed project's impact on utilization in affected facilities or services is calculated. Also, the appropriate and efficient use of existing facilities/services may be considered.

e.  The community reaction to the facility will be considered. The applicant may choose to submit endorsements from community officials and individuals expressing their reaction to the proposal. If significant opposition to the proposal is expressed in writing or at a public hearing, the opposition may be considered an adverse factor and weighed against endorsements received.

6.  **Access to the Facility or Service:** The contribution of the proposed service in meeting the health related needs of members of medically under-served groups which have traditionally experienced difficulties in obtaining equal access to health services (for example, Medicaid eligible, low income persons, racial and ethnic minorities, women, and handicapped persons), particularly those needs identified in the applicable State Health Plan as deserving priority. For the purpose of determining the extent to which the proposed service will be accessible, the state agency shall consider:

a.  The extent to which medically under-served populations currently use the applicant's services in comparison to the percentage of the population in the applicant's service area which is medically under-served and the extent to which medically under-served populations are expected to use the proposed services if approved;

b.  The applicant's performance in meeting its obligation, if any, under any applicable federal regulations requiring provision of uncompensated care, community service, or

11

access by minorities and handicapped persons to programs receiving federal financial assistance (including the existence of any civil rights access complaints against the applicant);

    c.    The extent to which the unmet needs of Medicare, Medicaid, and medically indigent patients are proposed to be served by the applicant; and

    d.    The extent to which the applicant offers a range of means by which a person will have access to the proposed facility or services.

* * * *

8.    **Relationship to Existing Health Care System**: The relationship of the services proposed to be provided to the existing health care system of the area in which the services are proposed to be provided.

III.    *Application of Relevant Case Law*

¶12.    In *Queen City Nursing Center v. Mississippi State Department of Health*, 80 So. 3d 73, 75 (¶2) (Miss. 2011), a case cited by HMA, Meadowbrook Health and Rehab LLC (Meadowbrook) applied to the DOH for a CON to construct a new sixty-bed nursing home in Lauderdale County. The owner of Meadowbrook, Bruce Kelly, purchased twenty-one beds from Kemper Homeplace, a nursing home in Kemper County that had been forced to close in January 2006. *Id.* at 75 n.2. In March 2007, Kelly placed the twenty-one beds in abeyance. *Id.* at n.3. Kelly also owned Poplar Springs Nursing Home, a thirty-nine-bed facility in Lauderdale County, Mississippi. Meadowbrook proposed to combine the twenty-one beds from Kemper Homeplace with the thirty-nine beds from Poplar Springs Nursing Home to build the new sixty-bed facility to replace the Poplar Springs Nursing Home. *Id.*

12

at 75 (¶2).

¶13.    The Mississippi Supreme Court agreed with the DOH's interpretation of Mississippi

Code Annotated section 41-7-191(1)(a) (Rev. 2013) and found that the Kemper Homeplace

was still an "existing" facility for purposes of the CON process. *Queen City Nursing Ctr.*,

80 So. 3d at 85 (¶35). Here, as was the case with the Kemper Homeplace beds in *Queen*

*City*, the beds in HMA's proposed new facility have been held in abeyance or de-licensed.

Further, just as in *Queen City*, all beds here are being moved to a new facility at a new

location within sixty months of the closing of the old facility. Therefore, we find that, for

purposes of the CON process, HMA's proposed new facility—containing the 144 beds that

it had de-licensed—is a replacement and relocation of GCMC.

¶14.    In *St. Dominic-Jackson Memorial Hospital v. Mississippi State Deparment of Health*,

954 So. 2d 505, 507 (¶1) (Miss. Ct. App. 2007), the CON applicant, Madison HMA,

proposed to close its old, outdated, sixty-seven-bed hospital and replace it with a sixty-

seven-bed hospital built in a more accessible location off of Interstate 55 in Canton,

Mississippi. We held:

> Unlike other recent applications for relocation that were determined to be
> expansions, Madison HMA is seeking a true relocation. No services will be
> duplicated. It will move its entire hospital to the Nissan Parkway and close
> the current location. Since this is a relocation, the criteria under which the
> State Health Department correctly reviewed the application is that for
> "Construction, Renovation, Expansion, Capital Improvement, Replacement
> of Health Care Facilities, and Addition of Hospital Beds." This section
> requires documentation of need by, but not limited to, showing licensure and
> code deficiencies, long-term plans, recommendations of consulting firms,
> deficiencies cited by accreditation agencies, and, if there is an expansion of
> emergency facilities, a statement concerning whether the hospital will

13

participate in the statewide trauma system.

*Id*. at 507 (¶2). Just as in *St. Dominic-Jackson Memorial Hospital,* the record in our case indicates that the DOH's grant of the CON was based on the specific criteria for relocation and the need component was evaluated according to the relevant sections. This case can be distinguished from a case with the same name, *St. Dominic-Jackson Memorial Hospital*, 728 So. 2d at 85 (¶14) (the North Campus case), where the Mississippi Supreme Court held that there was not sufficient evidence of need to support the grant of a CON for establishment of the North Campus facility because the facility would be new facility, rather than a relocation of an existing facility. Methodist Medical Center was attempting to establish a new medical center using its unused licensed beds, at its existing facility in south Jackson, to create a new location in north Jackson. Here, HMA is relocating all of its beds and will not have a footprint at its old location. Therefore, HMA's CON application is for a "true relocation" as espoused in *St. Dominic-Jackson Memorial Hospital*, 954 So. 2d at 507 (¶1), and *Queen City,* 80 So. 3d at 84 (¶35).

IV.    *General Review Criterion 3 (Availability of Alternatives)*

¶15.    The Gulf Coast Hospitals argue that the DOH's decision is not supported by substantial evidence with respect to this review criterion because there was substantial evidence indicating "that HMA did not conduct a full and genuine evaluation of less expensive options to constructing a new $133 million hospital" and that "the most obvious option [was] renovating the existing hospital," but that could not be done "because HMA [had] sold [the existing structure] before its architect even conducted an inspection of the

14

facility."

¶16.    Clearly, the DOH considered this criterion, as noted in the hearing officer's findings:

> As set forth in the application and staff analysis, [HMA] considered four alternatives to the proposed project, which the staff reviewed—relocate to a proposed location north of the old hospital; not reopen; construct fewer than 144 beds; or, renovate the old GCMC at the existing location. While [Ron] Luke testified he thought the alternative that HMA should have chosen was not to reopen and let the beds expire or construct fewer beds, [the Gulf Coast Hospitals nor any of their witnesses] disagreed that the proposed location was a poor location or that [HMA] failed to consider alternatives. In addition, [neither the Gulf Coast Hospitals nor any of their witnesses] testified that assuming [GCMC] was returned to service that it should do so at its current location. . . . [T]estimony both from [HMA] and [Don] Eicher demonstrated that the expenditure of large sums of money at the current location near the shoreline was not suitable for investment or patient care, especially when the population has shifted away from the existing location.

We find no merit in the contention that the DOH did not consider General Review Criterion 3. Although the testimony was conflicting, there was evidence to support the DOH's decision with respect to this criterion.[1]

*V.    General Review Criterion 5 (Need for the Project)*

¶17.    The Gulf Coast Hospitals argue that there was not substantial evidence showing the need to reopen GCMC. More specifically, Gulf Coast Hospitals argue that the need criterion set forth in subsection 3(a) of section 102.03 describes an "institutional need" and that the DOH did not properly evaluate need as specified in General Review Criterion 5. We disagree.

¶18.    As stated, in order to satisfy the need component, the State Health Plan requires the

---

[1] See pages 18-19 of the appendix attached to this opinion.

15

CON applicant to submit documentation satisfying the general criteria listed in the Mississippi Certificate of Need Review Manual *and* the specific criteria listed in section 102.03 for relocating or replacing an existing facility.

¶19. The DOH's staff reviewed HMA's CON application for compliance with the required general review criteria, as well as the specific need criteria under section 102.03, and recommended that the DOH grant the CON. The DOH's findings specifically addressed the Gulf Coast Hospitals' concerns that the "General Review Criterion 5: Need for Project"—as set forth in the Certificate of Need Review Manual—was not met. The staff analysis, reviewed by the DOH, considered

> the need that the population presently served has for the facility/service, the extent to which that need will be met adequately by the proposed relocation or by alternative arrangements, and the effect of the relocation of the facility/service on the ability of low income persons, racial and ethnic minorities, women, handicapped persons and other undeserved groups, and the elderly, to obtain needed health care.

HMA provided graphs and analysis regarding the population growth and the needs of the aging population, which the DOH reviewed.

¶20. At the hearing before the hearing officer, Don Eicher, the Director of the DOH's Office of Health Policy and Planning, testified that in determining the need component, the DOH analyzed hospitals' service areas in the Mississippi Gulf Coast area. In this case, according to Eicher, the primary service area of the proposed facility covers approximately five zip code areas, and the secondary service area includes another eight zip code areas. Eicher testified that the staff considered projections of population growth, historical trends,

16

and the patient discharge numbers in the service areas, among other factors, to determine the need to reopen GCMC. Eicher believed that the information in the staff analysis supported the grant of the CON, and stated, "[For] every application we analyze . . . future utilization rate, future occupancy rate . . . [and] future population growth."

¶21. On the other hand, Brenda Waltz, the hospital administrator for Garden Park Medical Center, a 130-bed facility in the Gulf Coast area, believed that the overall inpatient days are decreasing because there is "a lot more outpatient surgery, plus technology nowadays allows for simpler procedures . . . and patients aren't required to stay overnight. So that's a main contributor [for] the reason [of] the decrease in inpatient census." Waltz also testified that reopening GCMC would be "devastating" to Garden Park Medical Center.

¶22. The Gulf Coast Hospitals also presented Dr. Ronald Luke, a health planning expert. Based on official Mississippi growth projections, Dr. Luke concluded that, even by 2025, the Project would not meet the demand for inpatient service in the service area. Dr. Luke went on to state that maintaining the status quo, instead of creating additional beds, was the most appropriate alternative from a health-planning standpoint.

¶23. The hearing officer addressed each of the sub-parts of General Criterion 5. Since we have attached the hearing officer's findings of fact and conclusions of law, we pretermit a discussion of the evidence regarding the sub-parts here and refer to pages twenty through twenty-six of the appendix. It is sufficient to say, as is the case with all of the DOH's findings, that the evidence was conflicting. Yet out of the conflicting evidence, there is substantial evidence supporting the DOH finding of need under the general review criteria.

17

*VI. General Review Criterion 8 (Relationship to Existing Health Care System)*

¶24.    The DOH found that HMA demonstrated through its application and expert testimony that the Project will have a minimal adverse impact on the Gulf Coast Hospitals. In arriving at this conclusion, the DOH relied upon the expert testimony of Noel Falls. Falls, a Gulf Coast expert in health care planning, testified on behalf of HMA. He testified that he looked at the service areas of all hospitals in the area in great detail. Based on his findings, he concluded that there was little or no overlap, on average, between GCMC's and Singing River Hospital's service areas, but that there was an overlap with the service areas of Ocean Springs Hospital, Garden Park Medical Center, and Memorial Hospital of Gulfport. Nonetheless, Falls opined that an overlap is "fairly typical in cities that have more than one hospital . . . located relatively close . . . [to each other] and [that] these circumstances . . . exist[ed prior to January 2008] when GCMC was still operating. [GCMC] was getting patients from essentially the same areas." Falls also examined the growth in the general population and the sixty-five-and-older population and strongly felt that they provide a population base sufficient to support the relocation and reopening of GCMC. He also testified that the growth in the service area at issue actually exceeds what was "going on or even projected to happen prior to Hurricane Katrina."

¶25.    On the other hand, Thomas Davidson, a health planning expert testifying on behalf of the Gulf Coast Hospitals, observed that the facility is proposed in a service area that is "terribly, terribly over-bedded." Davidson opined that "this is not a situation in which growth would save the day. In order for [GCMC] to have success and meet it utilization

18

projections, it must not only do grievous, but sustained damage to other existing hospitals in the service area." Davidson based his opinion on the ten percent decrease in the average daily census bed count for the Gulf Coast-area hospitals from 2005 to 2011, noting that census data from GCMC was not considered in his analysis because, during that period, GCMC was closed down. He also stated: "The primary service area defined for the replacement hospital is absolutely vital to four [existing] hospitals. This is not a case of some peripheral or minor service area overlap." Davidson also believed that, based on HMA's application, ninety-five percent of the number of total admissions forecast for the future hospital in year three

> must come at the expense of the existing providers. This is the total impact that has to be absorbed by one hospital or another or [by] all of the hospitals in the service area in order for [GCMC] to achieve its utilization projections. There's no other place for these patients to come from.

Davidson also monetarized the amount he believed would be lost from the existing hospitals. Several CEOs from the other Gulf Coast Hospitals also testified that reopening GCMC would have a deleterious effect on the existing hospitals.

¶26.    It is sufficient to say that both HMA and the Gulf Coast Hospitals offered experts who gave conflicting testimony about the Project's impact on the existing health care system. However, as a review of the hearing officer's findings will reveal, the hearing officer favored Fall's testimony in finding that the Project would have minimal adverse impact on the existing health care systems.

    VII.    *Specific Need Criterion Under Section 102.03*

19

¶27.    The DOH also reviewed the evidence supporting the need requirement under section 102.03. This evidence included code deficiencies of the closed facility, the need to relocate the facility in light of its proximity to the shoreline, expert testimony on the structural damage of the closed facility, and evidence that HMA's long-term plan anticipated, at the time of closure, that the facility would eventually be relocated.

¶28.    Timothy Mitchell, former operator of HMA, testified regarding the condition of the closed hospital and stated, "[HMA] continued to have problems with the building [after Hurricane Katrina] because of the amount of time that it had sat, with damage to the drywall and everything else." Mitchell continued to explain that if the facility stayed at its current location on the coast, that there would be constant "issues with [the] mechanical equipment failing, like the cooling towers stalling, and out electrical panels just going out, power going out to part of the building . . . [and rust] from salt water intrusion." Mitchell also testified that at the time GCMC closed, there was already an initiative to relocate to a different site. He supported this claim by showing the notice of closure and a newspaper article prepared at the time, both referencing the plan to relocate.

¶29.    The record reflects that there were experts on both sides, and the DOH ultimately found that HMA had demonstrated a need to reopen and relocate the hospital. The DOH correctly points out that, "[b]y the Manual's own language, not every subpart is applicable to a proposed project." Nonetheless, the DOH reviewed the expert testimony on population growth, access by the current population to the proposed facility, numerous community endorsements, and the effect that the reopening of GCMC would have on existing facilities.

20

The DOH, as the fact-finder, determined that there would be minimal negative effect, if any, to the surrounding hospitals and the health care system.

¶30.     The DOH, as the fact-finder, makes the determination of the credibility of the evidence. *Dialysis Solutions LLC v. Miss. State Dep't of Health*, 96 So. 3d 713, 718 (¶11) (Miss. 2012). We find substantial evidence supporting DOH's factual findings. We also find that the DOH correctly reviewed HMA's CON application in accordance with section 41-7-191, the 2012 State Health Plan, and the DOH's Certificate of Need Review Manual. The Gulf Coast Hospitals would have this Court reevaluate the evidence presented to the DOH. It is not the role of this Court to reweigh the evidence if the DOH's findings are supported by substantial evidence. *See St. Dominic-Jackson Mem'l Hosp.*, 728 So. 2d at 83 (¶9). Therefore, our standard of review requires us to affirm the decision of the DOH. As such, we affirm the DOH's decision granting the CON to HMA.

¶31.     The dissent makes several points that in the dissent's view require that this case be reversed and remanded. First, the dissent says that the record lacks substantial evidence to support the DOH's decision to grant the CON. Second, the dissent states that the case law and the record reflect that the statutory requirements applicable to establishing a new hospital apply, not the less stringent requirements applicable to hospital relocations. Third, the dissents attempts to distinguish *Queen City* in a way to rob it of any applicability to our case. We briefly address each of these points in turn.

¶32.     Apparently the dissent, in asserting that DOH's decision is not undergirded by substantial evidence, would have us reweigh the evidence. Or perhaps more appropriately,

21

the dissent has already reweighed the evidence. It is well-settled law that an appellate court cannot and must not reweigh the evidence relied upon by an agency in its fact-finding process. The findings of fact by the hearing officer, which were approved by the State Health Officer show that the DOH utilized the proper standard of review and reviewed HMA's application in accordance with the applicable statutory law, the State Health Plan, and controlling case law. As to the dissent's attempt to distinguish *Queen City,* we simply say the facts are the facts. Here, as in *Queen City*, a hospital that had been closed down and its beds placed in abeyance or de-licensed was declared by the Mississippi Supreme Court to be an existing hospital for purposes of the CON application process. Additionally, those beds were coupled with beds from a still functioning facility that relocated to another area.

¶33.   While it is true that the DOH determined that HMA's application was for a relocation of GCMC, and, therefore, considered the requirements for relocating an existing hospital, it cannot be legitimately argued, based on an objective review of the hearing officer's findings, that the DOH did not also consider need generally for the replacement or relocation of GCMC.

¶34.   **THE JUDGMENT OF THE HINDS COUNTY CHANCERY COURT IS AFFIRMED, AND THIS CASE IS REMANDED TO THE HINDS COUNTY CHANCERY COURT FOR A DETERMINATION OF THE AMOUNT OF ATTORNEY'S FEES. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANTS.**

**LEE, C.J., GRIFFIS, P.J., BARNES, ISHEE, ROBERTS, MAXWELL, FAIR AND JAMES, JJ., CONCUR. CARLTON, J., DISSENTS WITH SEPARATE OPINION.**

22

BEFORE THE MISSISSIPPI STATE DEPARTMENT OF HEALTH

**In the hearing during the course of review in connection with**:

**CON REVIEW: HG-NIS-1111-022**
**HARRISON HMA, LLC d/b/a GULF COAST MEDICAL CENTER**
**CONSTRUCTION/RELOCATION AND REPLACEMENT of**
**GULF COAST MEDICAL CENTER**
**CAPITAL EXPENDITURE: $133,322,098**
**LOCATION: BILOXI, HARRISON COUNTY, MISSISSIPPI**

**HEARING OFFICER'S FINDINGS OF FACT,**
**CONCLUSIONS OF LAW AND RECOMMENDATION**

Having reviewed and considered the testimony and evidence introduced during the hearing on the above-styled certificate of need ("CON") application, I, the undersigned Hearing Officer, hereby issue the following Findings of Fact, Conclusions of Law and Recommendation.

**I.      SUMMARY OF PROCEEDINGS**

The Applicant, Harrison HMA, LLC d/b/a Gulf Coast Medical Center ("Gulf Coast Medical" "Applicant" "GCMC") submitted its Certificate of Need ("CON") application on November 28, 2011, titled the *Construction/Relocation and Replacement of Gulf Coast Medical Center* (the "Application").  The Application was deemed complete on January 3, 2011, and was recommended for approval by the Department's staff in a June 2012 Staff Analysis.  Singing River Health System, consisting of Singing River Hospital ("Singing River") and Ocean Springs Hospital ("OSH") (collectively "SRHS"), Memorial Hospital at Gulfport ("Memorial"), Garden Park Medical Center ("Garden Park"), and also James Crowell[,] representing Mississippi citizen consumers ("Crowell") (collectively the "Contestants") properly requested a hearing during the course of review.  (While Crowell is included as a "Contestant," Crowell presented no testimony or evidence during the Hearing and his attorneys only asked a handful of questions all concerning

Biloxi Regional Medical Center. Tr. 300-01, 1160. Highland Community Hospital also requested a hearing, but it withdrew its request. Tr. 6.) The "Hearing" took place August 22-24, 2012 and September 4-7, 2012, and after each party was afforded the opportunity to present evidence and testimony to support its position and members of the public were invited to comment on the Application, the Hearing was concluded.

It is the responsibility of this Hearing Officer to review all evidence and testimony and to set forth the findings of fact and conclusions of law regarding this matter. In summary, I find that the Application does substantially comply with the CON law, the 2012 State Health Plan's ("Plan") criteria and goals, the CON Manual's general review criteria, and the four general policy goals of the Plan. Specifically, I find this Application is one for the replacement and relocation of a closed hospital which under the CON law is treated as currently existing as it has not yet been closed for sixty months. Though the Contestants argued that the Applicant did not demonstrate "need" for the project, I believe that the Applicant demonstrated substantial compliance with the appropriate need criterion in the Plan regarding the replacement of healthcare facilities. In addition, testimony also demonstrated compliance with General Review Criterion 5 concerning the need for the project. While the Contestants argued that the replacement hospital would have a significant adverse impact on the existing hospitals, the Applicant demonstrated that the information utilized by the Contestants to project their anticipated adverse impact failed to take into account the entire projected population of Harrison, Hancock and Jackson counties which currently utilize the hospitals and instead focused solely on population data for thirteen zip codes projected by the Applicant as its primary and secondary service area.

For at least these reasons, all of which are set forth in detail in the following sections of this Opinion, the Application should be approved.

## II.    THE APPLICATION

The Application proposes to relocate and replace the 144 bed Gulf Coast Medical Center which closed in January 2008 and to reinstate magnetic resonance imaging and obstetric services. Ex. 2, 3.  The building which housed Gulf Coast Medical is located 300 yards from the Gulf of Mexico, and during Hurricane Katrina it received wind and water damage.  Tr. 233, 358, 368; Ex. 2, 29.  The Hurricane also destroyed the buildings between the shoreline and the hospital so that currently there is nothing located between the old GCMC and the Gulf of Mexico.  Tr. 363, 370. It was undisputed that the GCMC location is in an area susceptible to future hurricanes and damage.  Tr. 365; Ex. 29.  After the Hurricane in August 2005, Health Management Associates, Inc. purchased Gulf Coast Medical. After purchasing and operating the hospital from May 2006 through January 2008, at a location that was still recovering from the Hurricane and losing both population and physicians, Health Management closed the hospital on January 3, 2008.  Tr. 8, 212; Ex.2.  On or about February 11, 2008, Gulf Coast Medical requested that the Department put its 144 acute care beds in abeyance, a request which the Department accepted per letter dated April l, 2008.  Ex. 5.

The replacement hospital, to be known as The Hospital at Cedar Lake, will be located immediately south of and adjacent to Interstate 10 in an already existing medical community. Ex. 2.  The proposed site is four miles from the Gulf, and did not experience flood waters during the Hurricane.  Tr. 368; Ex. 3, 5.

## III.    THE STAFF ANALYSIS

In June 2012, the Mississippi State Department of Health (the "Department") rendered its staff analysis which recommended approval of Gulf Coast Medical's CON Application (the "Staff Analysis"). Ex. 3. The Department's Staff determined that the project was one for the replacement and relocation of a general acute care hospital and reviewed it as such. Ex. 3. Don Eicher ("Eicher"), Director of the Office of Health Policy and Planning, testified that the Department believed it had all the information it needed to make a recommendation regarding the Application. Tr. 25-26. This was true regardless of the Application not including a signed cost estimate or contract for land. Tr. 150-51. The Staff Analysis determined the project was in substantial compliance with the four goals of the Plan, the Plan's criteria, the General Review Criteria in the CON Manual and all adopted rules, procedures, and plans of the Department.

## IV. WHAT IS BEING PROPOSED BY GULF COAST MEDICAL IS THE REPLACEMENT AND RELOCATION OF A HOSPITAL, NOT A NEW HOSPITAL

The first consideration regarding the Application is whether or not Gulf Coast Medical proposes to establish a new general acute care hospital since that determination impacts which of the SHP criteria are applicable. Based on the following discussion, I believe the Application does not propose the establishment of a new general acute care hospital but instead proposes a replaced and relocated hospital.

### A. *Mississippi Case Law Distinguishes Projects for Relocation Versus Projects for New Healthcare Facilities.*

The Mississippi Supreme Court has repeatedly stated that in reviewing a proposed project, "the showing of need must be commensurate to what the project actually is." *St. Dominic-Jackson Mem'l Hosp. v. Miss. Slate Dep't of Health & Madison HMA, Inc.,* 87 So. 3d

1040, 1046 (Miss. 2012) ("St. Dominic 2012"). That *St. Dominic 2012* case involved the proposed "relocation" of a portion of its hospital to Madison County. *St. Dominic, 87 So. 3d at 1042*. The Court determined in the *St.. Dominic* 2012 case that the project was actually for a new hospital, or a "mini version of its Jackson campus." *St. Dominic* 2012, 87 So. 3d at 1052. Determining whether the Application proposes a "new" hospital or "relocated" hospital is essential to determining what need criteria applies so that the correct showing of need can be required.

This Application proposes to replace and relocate the old GCMC. Though GCMC closed in 2008, it placed its 144 beds in abeyance and is still considered an "existing" hospital under the CON law. Tr. 26. Eicher testified, a facility

> can put all [its] beds in abeyance and close, and state law provides that as long as you're not closed within 60 months or more, then you're not considered a new facility. So, theoretically, a facility could close up to 60 months or five years and then reopen. The caveat would be whether reopening would cause you to make a capital expenditure, an expenditure in excess of 2 million. If that's the case, then a CON would be required.

Tr. 27. Currently and until the expiration of 60 months, the beds held in abeyance by GCMC remain part of the state's inventory and can be returned to service without the requirement of a CON. Tr. 28-29; Ex. 5; *See* Miss. Code § 41-7-191(1)(m) (stating "reopening a health care facility that has ceased to operate for a period of sixty (60) months or more" requires a CON "for the establishment of a new health care facility" to reopen); *Queen City Nursing Ctr., Inc., et. al v. Miss. State Dep't of Health & Meadowbrook Health and Rehab, LLC,* 80 So. 3d 73, 85 (Miss. 2011) (stating closed facility which has beds in abeyance "is still an 'existing' facility for purposes of the CON process. The CON statute does not require a CON if a facility attempts to

reopen within sixty months of ceasing to operate."); 2011 Miss. AG Lexis 334. *3 (stating facility is "existing" facility for CON purposes until closed for 60 months).  In fact, when GCMC's 144 beds were placed in abeyance, Rachel Pittman, then chief of the CON division, wrote GCMC a letter which stated that "upon proper notification to and approval by the Department, these beds may return to service without the requirement of a Certificate of Need." Tr. 402-03; Ex. 5. Similarly, Robert Pascasio, the CEO at Hancock Medical Center, testified that after the Hurricane, Hancock Medical put some number of its beds in abeyance and has been bringing them back online without CON review because he testified it was simply a "recovery of preexisting beds . . . "  Tr. 538, 540.  As Eicher stated, the reason GCMC needs a CON to reopen the beds is that the capital expenditure is over 2 million dollars.  Tr. 27.

The classification of the beds as existing beds is important since the proposed relocated beds are not "additional" beds, prohibited from being relocated, but are beds existing in the State's bed inventory though in abeyance. Ex. 5.  When Singing River previously sought to "relocate" licensed but unused beds to OSH, the Supreme Court held the result would be the *"addition"* of beds to OSH.  *Singing River Hosp. 819. v. Biloxi Reg'l Med Ctr.,* 928 So. 2d 810, 811, 813 (Miss. 2006) (emphasis in original).  The Court stated that Singing River's CON application did not propose the relocation of a health care facility or of a health service[,] but instead the proposed relocation would be a change in existing bed complement at OSH.  *Singing Riv.,* 928 So. 2d at 813. That change in bed complement could not be avoided by the use of relocated beds since the statute regarding bed additions does not include "relocated" beds. *Singing Riv.,* 928 So. 2d at 813.  The Court thus concluded that the

relocation of unused but already-licensed beds from one health care facility to

another is not contemplated under the relevant statute. The statute only uses the word "relocation"when speaking of the relocation of an entire or a portion of a health care facility, or of health services, not of beds." Finally, and most importantly, the proposal, in actuality, is for Ocean Springs to *add* sixty beds.

*Singing Riv.,* 928 So. 2d at 814 (italics in original). Singing River's prior attempt at relocating beds failed because the Court found the relocation of licensed, unused beds from one facility to another would be the "addition" of beds. However, the proposed GCMC project does not seek to relocate beds from one facility to another increasing the bed complement at the accepting facility, but instead, in compliance with the Court's conclusion, seeks to relocate its entire, existing facility. Thus, there is not an anticipated change in bed complement at GCMC as would have occurred, in violation of statute, at OSH as a result of SRHS' s proposed relocation. Furthermore similar to another CON applicant who sought to relocate beds that had been held in abeyance to a replacement nursing facility, the Court agreed that "no new beds would be established" by the relocation/replacement since the beds in abeyance would be reestablished. *Queen City,* 80 So. 3d at 78. In *Queen City,* the Court agreed with the Department's decision that the construction of a new building would not be considered new for health planning purposes since it would replace a previously operating but still existing provider. *Queen City,* 80 So. 3d at 85. Similar to the GCMC beds, because the beds in *Queen City* were in abeyance for less than 60 months they were not "new" but were "currently existing beds" capable of being relocated to a replacement facility[.] *Queen City,* 80 So. 3d at 85.

Therefore, because GCMC has not been closed for more than 60 months, it is considered **an existing healthcare facility with existing beds** under the CON law, and its Application is one for the replacement and relocation of that old facility and beds, not a new healthcare facility

with new beds in the service area.  Tr. 400; Ex. 6.

Per the Plan, the Department "intends to approve" a CON application "if it substantially complies with the projected need and with the applicable criteria and standards presented" in the Plan. Ex. 10.  Though the Contestants put forth various reasons why the proposed project should be disapproved, they failed to argue that the Application did not comply with the applicable portions of the Plan.  As discussed below, the Application complies with the applicable Plan Need Criterion for the replacement of healthcare facilities and thus it should be approved.  And the Supreme Court has accepted the State Health Officer's decision that "there is no occupancy standard which applies to replacement projects." *CLC of Biloxi, et. al v. Miss. Dep't of Health & Harrison Co. Prop., LLC,* 91 So. 3d 633, 638 (Miss. 2012) (concerning relocation and replacement of nursing home destroyed by Hurricane Katrina).

While the Application complies with the applicable Plan need criterion along with the applicable manual general review criteria, it should also be noted that this project complies with the supreme court's rulings regarding the relocation of healthcare facilities.  A "relocation is a transfer of an entire health service" so that "the transferring facility would no longer have the authority to provide the same service." *St. Dominic*, 87 So. 3d at 1047.  The Application proposes a true relocation as all authority to provide services and operate an acute care hospital will be relocated from the prior GCMC site to the proposed site in north Harrison County. While the Court has frequently reviewed an applicant's plans to hire new employees, buy new equipment, and construct a new building in determining if a project proposes a new hospital, it has stated those items are not "individually prohibited under CON law." *St. Dominic*, 87 So. 3d at 1048.  Most importantly where the Court considered new employees, new buildings,

and new equipment in cases involving a proposed relocation, the relocation concerned a currently operating facility. GCMC's facility, which was damaged by the Hurricane, will be completely replaced and relocated. Since it has been closed, new employees and new equipment will be obtained. The relocation of GCMC is similar to the replacement and relocation of Madison HMA which was a true relocation. *St. Dominic-Jackson Mem'l Hosp. v. Miss. State Dep't of Health & Madison HMA, Inc.,* 954 So. 2d 505 (Miss. Ct. App. 2007). In that case, similar to GCMC, no services were duplicated and the entire hospital was relocated. *Id.*

In compliance with prior case law, the Department's staff correctly reviewed this project as one for the replacement and relocation of an existing healthcare facility.

## V.     COMPLIANCE WITH THE PLAN SERVICE SPECIFIC CRITERIA

### A.     *Applicable Methodology for the Proposed Hospital*

Unlike previous hospital CON projects, which Plan methodology Gulf Coast Medical's Application must comply with was not a major issue debated at the Hearing. In fact none of the Contestants argued that this project should comply with the Plan criteria regarding new general acute care hospitals, and the attorney for SRHS and Memorial stated that the Application was not subject to the criteria for a new hospital. Tr. 736, 1088.

Falls testified that when you are reviewing a project and considering the "need for a new facility, you go to the criteria and standards for a new facility," in the Plan as most every project "is tied to some criteria and standard in the State Health Plan." Tr. 352, 1171. Under the Plan, that proposed hospital will be in a county without a hospital; in a county with a hospital; in a rapidly growing county; or, as in this situation, will be for the replacement of a hospital. Tr. 1171-72. If you try to use the criteria for a new hospital, which contains occupancy standards,

along with the replacement criteria,

> you'd never be able to relocate or replace a hospital in the State of Mississippi. I mean, it's just – it's an illogical assumption to reach, that you should go back and use one of those other criteria and standards to determine a need for a hospital for purposes of relocation,

Falls testified. Tr. 1172; *See also CLE of Biloxi,* 91 So. 3d at 638 (stating Plan contains no occupancy standard for replacement projects).

The applicable Plan criteria is Section 102.03, CON Criteria and Standards for Construction, Renovation, Expansion, Capital Improvements, Replacement of Health Care Facilities, and Addition of Hospital Beds, subsection (3), Projects which do not involve the addition of any acute care beds. Ex. 7; Tr. 54, 78, 401-02. This Section states:

> **102.03 Certificate of Need Criteria and Standards for Construction, Renovation, Expansion, Capital Improvements, Replacement of Health Care Facilities, and Addition of Hospital Beds**
>
> **. . .**
>
> **3.      Need Criterion:**
>
> > a.      Projects which do not involve the addition of any acute care beds: The applicant shall document the need for the proposed project. Documentation *may* consist of, but is not limited to, citing of licensure or regulatory code deficiencies, institutional long-term plans (duly adopted by the governing board), recommendations made by consultant firms, and deficiencies cited by accreditation agencies (JCAHO, CAP, etc.). In addition, for projects which involve construction, renovation, or expansion of emergency department facilities, the applicant shall include a statement indicating whether the hospital will participate in the statewide trauma system and describe the level of participation, if any.

Ex. 7; Tr. 54 (italics added). The Plan states that an applicant "may" provide the documentation listed above to demonstrate its compliance with the examples set forth in the Need Criterion. As discussed below, the Applicant demonstrated its compliance with this Need Criterion.

1.     <u>The Old GCMC Building Has Numerous Code Deficiencies & the Applicant Obtained Consultant Recommendations To Replace and Relocate the Hospital.</u>

Danny Cawthon ("Cawthon"), an architect who testified as an expert in healthcare facility construction, testified regarding the deficiencies at the old GCMC and his recommendation, Tr. 236; Ex. 17. Prior to his testimony, Cawthon toured the old GCMC and documented his observations by taking pictures. Ex. 18. Based on his observations Cawthon testified regarding his impression of the facility. "Overall, the facility is in extremely bad shape '" probably one of the worst I've encountered . . . . It would be not even suitable for an office building, much less a hospital." Tr. 238. In general Cawthon's pictures and corresponding testimony demonstrated that moisture had entered and damaged the building as evidenced by water stains, mold, and the condition of the ceiling; that the parking lot failed because of water; that the copper piping was corroded and would have to be replaced; and that asbestos exists in the building. Tr. 233, 241, 245, 246-50, 252, 255. Testimony also demonstrated that the chillers for the facility were on the ground floor and suffered irreparable salt water damage, and that the generators were also at ground level. Tr. 243-44. Also the current windows would not withstand Hurricane winds. Tr. 243-44. Tim Mitchell ("Mitchell"), the former CEO at Biloxi Regional and currently the CEO at River Oaks and Marketing Manager for Health Management's Jackson area hospitals, testified that during the time Health Management operated GCMC[,] the hospital was constantly having issues with mechanical equipment failures, the cooling tower stalling, and power going out in the building which the repairmen linked to salt water intrusion. Tr. 225. The Contestants implied that some of the existing damage was a result [of] Health Management not maintaining the building. Tr. 678-79, 705. However, whether the moisture, mold and corrosion were directly

attributable to the Hurricane or a result of the facility being closed, the fact remains that those issues exist and would have to be repaired. Even SRHS's witness, Randall Cobb ("Cobb"), an expert in mechanical engineering and health facilities engineering and the system director of facility support, acknowledged the existence of the damage and the necessity to bring the facility up to code as discussed below.[2] Tr. 626, 639, 705-07, 709-11.

Regardless of the existing damage caused by water, there are numerous code deficiencies that would require correction through significant renovation prior to reopening the old building as a hospital. Because of the changes in building and life safety codes from the time of the building's construction until now, Cawthon testified the old GCMC "wouldn't meet anything near today's standards." Tr. 239-40. When renovation of more than 50% of a healthcare facility is undertaken, it must be brought up to current codes, and in this situation, the entire facility would be renovated meaning all of it would have to be brought up to today's code. Tr. 303-05. Cawthon's testimony regarding code violations at the old hospital included holes between floors and fire dampers that no longer work and a lack of the required number of handicap bathrooms under the Americans with Disabilities Act. Tr. 247-48, 253. The new Life Safety Code standards would also require widening the ICU corridor from six to eight feet which would require gutting and renovating that end of the hospital. Tr. 253. While not necessarily a code deficiency, Cawthon testified the emergency entrance and main entrance were cramped and would need to be widened and that the patient rooms were too small by today's standards. Tr. 244, 246, 249-50. The old hospital also had semi-private rooms which would need to be renovated by taking three rooms and making two which would require reducing the number of available beds or constructing a new addition. Tr. 251-52.

---

[2] There was conflicting testimony regarding the amount of water that entered GCMC as a result of the Hurricane. Regardless of how much water entered the hospital, everyone agreed the current building is damaged, would have to be renovated, and would have to be brought up to code.

Cawthon testified based on his experience and analysis of the conditions at the old GCMC in order to gut and renovate the old hospital including the replacement and enlargement of the parking lot the cost would be 20 to 25 million, and in order to maintain the bed count (due to the expansion of existing spaces in the old building), a new addition would cost another 20 to 25 million for a total of 40 to 50 million. Tr. 258, 263, 265·66; Ex. 21. This 40 to 50 million dollar estimate does not consider the cost of equipment, which is estimated at 46 million for the proposed hospital. Tr. 258, 263, 266; Ex. 21. Cobb questioned whether all the costs for the replacement hospital had even been included, but he acknowledged that at this point in the process, there is no way you could have everything in an estimate. Tr. 696. Thus, adding those numbers together results in a project which would cost at least between 86 and 96 million dollars and still be located in an area prone to hurricane damage. Cawthon testified based on his experience and analysis of the conditions at the old GCMC that he would not advise building a hospital or renovating the current GCMC site because of the close proximity to the beach and because of the lack of access roads. Tr. 257. Instead, Cawthon testified he recommended the proposed location since the replacement hospital would be above the nearest storm surge level; have easy access by 1-10; have ample parking; have easy access to the emergency entrance; have surgery areas near the emergency areas and near radiology service; have an ICU on the second floor for easy transport; have two access points; have two generators; have two electrical feeds with two entirely different grids coming into the hospital; have two entirely different water

sources; and, have exterior walls and windows designed for at least 140 miles per hour gale force winds. Tr. 261-62, 276-78. Cawthon concluded,

> it would take a lot of money to rehab and redo the old hospital. And location, location, location is everything, and you're still at the same spot. So in were a businessman and looking at this, and I put that much money into it, yet I've got a nice new hospital, but I'm still less than a thousand feet from the beach, I wouldn't do it. That's a huge risk, ... [M]y recommendation is definitely to move.

Tr. 262-63.

Noel Falls ("Falls"), the Applicant's expert in healthcare planning, testified that one of the primary goals of the Application was to move the "hospital out of harm's way and keep it accessible to the population." Tr. 352, 362. His recommendation was to find a site that was out of harm's way but still accessible to the population, ideally along the interstate. Tr. 362. Taking into account the age of the GCMC building and its old design with small patient and operating rooms, the current location "is not a suitable place to build a replacement facility," Falls testified. Tr. 370-72. To make a significant investment in a renovated building at the old site "just didn't make any sense to me at all," Falls testified. Tr. 363. Brenda Waltz ("Waltz"), the CEO at Garden Park, agreed that if a hospital on the Coast was to be relocated, moving it away from the shoreline would be important. Tr. 506.

The existing issues and code deficiencies at the old GCMC along with the recommendations from both Cawthon and Falls demonstrate compliance with this prong of the criterion.

> 2.      Health Management Intended to Replace and Relocate the old GCMC at the Time It Closed.

In compliance with this prong of the criterion, Mitchell testified that at the time GCMC

was closed Health Management was considering relocating the hospital and that different sites were considered at the time of closing. Tr. 213, 222, 228-29; Ex. 16. Further evidence of the parent company's prior and long-standing intention to replace and relocate the hospital is demonstrated in the notice of closure from GCMC and a local newspaper article, both prepared and issued near the time of closing. Ex. 14, 16. Thus, there is evidence of the entity's long-term plan for the hospital.

### 3. The Proposed Hospital Will Seek Participation in the State's Trauma System

The final prong of the applicable need criterion requires an applicant that proposes a project involving the construction of an emergency department to include a statement indicating whether the hospital will participate in the trauma system and the proposed level of participation. Ex. 7. As stated in the Application, the new hospital will seek certification as a Level III trauma center. Ex. 2, SRHS argued that the Gulf Coast area has ample trauma centers and the addition of another participating hospital would dilute specialty coverage at area hospitals. Tr. 563-64, However, Contestants admitted that current staff shares call requirements for trauma coverage, and it could be anticipated that those specialties would continue to share call to provide trauma coverage. Tr. 502, 601-02. Furthermore, Eicher testified that in past conversations with the trauma division at the Department, he understood the State needed more Level III centers, such as the one proposed, to ease pressure on the Level I and Level II centers, Tr. 173. Regardless, as the Contestants' expert agreed, the criterion simply requires an applicant to state its plan regarding trauma participation, a requirement which the Applicant met. Tr. 1143.

For these reasons, the Department's staff was correct in its findings that the Application met the applicable Plan Need Criterion for the replacement of an existing hospital.

B.      *The Hospital's Proposed MRI Service Meets the Applicable Plan Criteria.*

As part of the CON Application, GCMC sought authority provide MRI services at the replacement hospital. Ex. 2. The Staff Analysis determined the Applicant had complied with the Plan's MRI criteria. Ex. 3. While the Plan contains additional requirements, with which the Applicant complied, the only contested aspect of the criteria concerned the Applicant's projection that it would perform 2,700 scans by the end of the second year of operation. Ex. 8. That portion of the Plan states,

> 1.      Need Criterion: The entity desiring to offer MRI services must document that the equipment shall perform a minimum of 2,700 scans by the end of the second year of operation . . . .

Ex. 8 (bold removed). Prior to the hurricane, GCMC operated a fixed 1.5T unit. Tr. 403; Ex. 3. During Eicher's testimony, he mistakenly stated that GCMC currently provided MRI services; however, after Garden Park's attorney brought the mistake to his attention, he acknowledged he had misunderstood the current MRI providers on the Coast, but testified the MRI portion of the Application still complied with the Plan. Tr. 109, 200. Eicher testified since GCMC previously provided MRI service, the Department would anticipate it would perform a similar number of scans; that in compliance with Plan requirements, the staff calculated the need for the MRI service compared to the population and state's MRI use rate; that the staff reviewed the projected utilization and projected population; and that a proposed trauma center would need an MRI unit. Tr. 100, 109, 111, 200. Though the Application proposed a higher use rate per 1000 in population, both the proposed use rate and the Department's use rate resulted in a projected number of procedures which complied with the Plan's methodology of 2,700 scans by the end of the second year of operation. Ex. 2, 3; Tr. 403-04.

In addition, testimony at the hearing demonstrated that the unit proposed in the Application, a 3.0T, was a stronger unit than what was readily available on the Coast. Tr. 1058-59. One of the physicians at Singing River testified that the images obtained from a 3.0T unit are better and obtained in a shorter period of time. Tr. 1051, 1053-54. The doctor also testified that if Singing River bought another unit, he would want a 3.0T unit such as the one proposed. Tr. 1059.

The Department found, and testimony supported its finding, that the Applicant met the Plan's MRI Criteria.

C.      *The Hospital's Proposed Obstetric Service Meets the Applicable Plan Criterion.*

Also as part of the CON Application, GCMC sought authority to provide OB services at the replacement hospital. Ex. 2. Like MRI, prior to closing GCMC, the hospital offered obstetric services and proposes to dedicate the same number of acute beds as OB beds that it previously used. Tr. 404. The applicable criterion, in Section 103, which was addressed in the Application, primarily requires that an applicant demonstrate that it will deliver 150 babies. Ex. 2, 9. Prior to closing, GCMC was delivering 150 babies. Tr. 404. The Department, after reviewing the Application and Plan, agreed the Applicant met the Plan's criteria for obstetric services in that the replacement hospital would deliver 150 babies. Tr. 404; Ex. 3.

## VI.     COMPLIANCE WITH THE CON MANUAL GENERAL REVIEW CRITERIA

In addition to complying with the requirements of the State Health Plan, applicants for a CON must meet the general review criteria in the CON review manual. The CON Manual contains certain rules, regulations, and procedures to which the Department must adhere in considering whether to grant or deny a CON application. The CON Manual contains sixteen

general review criteria by which CON applications are judged. As discussed below, the testimony and evidence presented at the Hearing demonstrated substantial compliance with the General Review ("OR") Criteria. The Staff Analysis considered the GR Criteria and determined the Application complied with each applicable one. Ex. 3. Instead of restating the findings in the Staff Analysis which were not questioned by the Contestants (or which have been discussed above), the discussion below concerns those GR Criteria with which the Contestants sought to demonstrate the Applicant had failed to comply.

*A.     GR Criterion 3, the Applicant Considered the Availability of Alternatives.*

As set forth in the Application and Staff Analysis, the Applicant considered four alternatives to the proposed project which the Department's staff reviewed - relocate to a proposed location north of the old hospital; not reopen; construct fewer than 144 beds; or, renovate the old GCMC at the existing location. Tr. 120-21; Ex. 2, 3. While Luke testified he thought the alternative the Applicant should have chosen was to not reopen and let the beds expire or construct fewer beds, none of the Contestants' witnesses disagreed that the proposed location was a poor location or that the Applicant failed to consider alternatives. Tr. 1102, 1112. In addition[,] none of the Contestants' witnesses testified that assuming the hospital was returned to service that it should do so at its current location. Though SRHS and Memorial argued in their brief that renovating the building at its existing location should have been more thoroughly considered by the Applicant, testimony both from the Applicant and Eicher demonstrated that the expenditure of large sums of money at the current location near the shoreline was not suitable for investment or patient care, especially when the population has shifted away from the existing location. While Luke may have preferred the Applicant to choose another alternative, the

Applicant's choice to relocate and replace the hospital in an area the Department agreed was a good location does not demonstrate the Applicant failed to consider alternatives. Thus, the Applicant complied with this General Review Criterion.

        *B.      GR Criterion* 4, *the Proposed Project Is Economically Viable.*

The Application, Staff Analysis and testimony at the hearing demonstrated that the proposed project will be economically viable. This genera] review criterion requires an applicant's financial projections be reasonable. Ex. 11.

In order to demonstrate the economic viability of the project the Department's staff considered and analyzed the Applicant's projected utilization level and found it reasonable[,] given the area's population growth. Tr. 37, 123-24, 162, 165. While Contestants attempted to rely on historical utilization numbers both at GCMC and at the competing hospitals to question the Applicant's utilization projections, they did not present testimony or evidence which demonstrated the Applicant's utilization projections were unreasonable. Thus, while the historical numbers do show a decrease in utilization, Eicher explained that the staff "factored in future years, so there would be future population growth and future needs," and stated he couldn't simply "look at historical data that only sets the trend to start with . . . you still [have] to project out, and that's what the Applicant has done here." Tr. 124.

Dan Sullivan ("Sullivan,"), an expert in healthcare planning and healthcare finance, testified the proposed project is financially feasible. Tr. 321, 323. Sullivan testified that the approach taken by the Applicant to prepare the financial projections and utilization projections was reasonable. Tr. 327, 341. He testified,

There's no such thing as an accurate projection because a projection is something

that happens in the future. It's how reasonable it is. And I think that's the test that we're talking about is, are you basing the projections on reasonable underlying assumptions? In this case, I think the application was based on reasonable underlying assumptions.

Tr. 341 (internal citations omitted). Sullivan tested the reasonableness of the Applicant's projections by applying more conservative assumptions to ensure the project was economically viable, especially as the projections related to staffing and salaries. Tr. 329, 331-32, 335-39; Ex. 24. Sullivan's testimony regarding his review and analysis of the financial projections demonstrated the project was economically viable, and the Contestants failed to put forth any substantial evidence suggesting otherwise. The Applicant thus demonstrated its proposed project was economically viable in compliance with this GR Criterion.

    *C.    GR Criterion 5, the Applicant Demonstrated the Need for the Project.*

General Review Criterion 5 states that "one or more of the following items may be considered in determining whether a need for the project exists." Ex. 11. By the Manual's own language, not every subpart of GR Criterion 5 has to be applied, and as stated in GR Criterion 5, not every subpart is applicable to a proposed project. In finding the Applicant complied with GR Criterion 5, Eicher explained the staff reviewed the Application under GR Criterion 5 by reviewing the discharges for the service area, GCMC's historical utilization, area hospitals' historical utilization, projected utilization, population projections, proposed services, proposed location, projected patient mixes, and the likelihood that the population would utilize the hospital. Tr. 129-133.

    1.    Subpart 5(a).

Subpart 5(a) states the Department may consider the "need that the population served or

to be served has for the services proposed to be offered . . . . " Ex. 11. In order to ensure the replacement hospital remained accessible to the population but moved away from the coastline, Falls reviewed the patient population the old GCMC served and the patient population that the replacement hospital would serve. Tr. 372-73; Ex. 29. Falls determined that the previous GCMC and the replacement hospital would serve the same zip codes, though the primary and secondary service areas would be reversed because of the shift in population as most of the growth in population is in northern Harrison County. Tr. 373-75; Ex. 29. Falls reviewed both the county population growth and zip code level growth. Tr. 386. From the time the Application was prepared to the time of the hearing, new data from ESRI (a national demographic data house which is normally relied upon by experts) published its 2016 population projections which Falls had originally extrapolated for the information in the Application. Tr. 386-87; Ex. 29. ESRI's new projections confirmed a growth in the proposed service area by 2016. Tr. 388. With the 2010 Census data now available, the information shows that the growth in some zip codes along the Coast is "actually much greater than we anticipated," in the Application[,] Falls testified. Tr. 388. In addition to more up-to-date ESRI projections, since the filing of the Application, the Institutions for Higher Learning (IHL") released its population projections which demonstrate a substantial increase in population from that originally projected for Harrison County by 2015 and with a continuing increase into 2020. Tr. 389; Ex. 30. Per the IHL projections, every county in General Hospital Service Area 9, the applicable Service Area, will experience population growth. Tr. 389-90; Ex. 30. Luke agreed there was a 12% increase in population projected from 2010-2020 in Harrison County, and for the three county coastal area there would be a growth rate projected of 10.9%. Tr. 1147-48. The growth in population is "important because the growth

will drive the number of discharges and whatever impact there might be on existing providers," Falls stated. Tr. 389.

In addition to the general population growth, Falls testified that the 65 and older population in the projected primary and secondary service areas was expected to grow at about 32.7 % between 2011 and 2016. Tr. 391. Falls testified the 65 and older population "uses hospital services . . . at about three times the rate as the rest of the population," and "drive[s] to a large extent the utilization of inpatient care." Tr. 391; Ex. 29 at 35. Luke testified between 2010 and 2017 the growth rate for those 65 and over was 36% in Harrison and Jackson Counties alone. Tr. 1149·50. Falls concluded the population growth in the area "provides a population base sufficient to support the relocation and reopening of Gulf Coast Medical Center and limit[s] to some extent the impact on the other hospitals in the Service Area, with the exception of Biloxi Regional Medical Center." Tr. 391.

2.      Subpart 5(b).

Falls testified that the subpart which most closely applies to the Application is GR 5(b). Tr. 407. Subpart 5(b) states:

> In the case of a relocation of a facility or service, the need that the population presently served has for the service, the extent to which that need will be met adequately by the proposed relocation or by any alternative arrangements . . .

Ex. 11. In addition to the projected population growth discussed above, the proposed hospital was planned to be accessible to both the patients it served prior to its closure and to those it plans to serve -all in the same service area. Tr. 408. It was also planned in order to capture the same medical staff, to the extent they remained in the area, as it previously had at GCMC. Tr. 408. Furthermore, while the Contestants argued that the service area hospital's should reach the

benchmark of a 60% occupancy level prior to the approval of new beds, this benchmark is not applicable to this Application as that occupancy threshold is utilized tor acute care bed expansions, not the replacement of an existing hospital and existing beds. The Applicant demonstrated that the proposed hospital would be accessible to its anticipated patients and to areas of population growth.

3.    Subpart 5(c).

Subpart (c) allows the Department to consider the current and projected utilization of like facilities/services to determine the need for additional facilities/services. Ex. 11. Testimony demonstrated that area hospitals were expanding services and expeliencing increased demand. SRHS is undertaking capital projects to handle the patient demand on the Coast including adding Level II rehabilitation beds, renovating rooms, modernizing the hospital, and undertaking mechanical and electrical upgrades. Tr. 584-85. In addition SRHS is currently expanding OSH to add observation beds. Tr. 586. This 84,000 square foot tower addition will allow OSH to re-utilize acute beds that were being used for observation patients. Tr. 586-87, 590. This re-utilization is supported by one of OSH's physicians who stated in the local newspaper, "Beds are definitely needed at the hospital. It's going to allow us to take care of more patients here in the community. The community is growing." Tr. 587; Ex. 40. In addition, an administrator at OSH stated in that article, "On occasion, we have been on diversion, which is a situation we're really trying to avoid because then we're looking at transferring patients to our sister facility." Tr. 588; Ex. 40. In addition, Kevin Holland ("Holland"), SRHS's chief operating officer for hospital operations, agreed that both OSH and the emergency room have been on diversion. Tr. 588. The OSH administrator also stated that "our Service Area has been probably one of the

highest growth rates in the region." Tr. 588; Ex. 40. Holland and Chris Anderson ("Anderson"), the CEO for SRHS, testified the hospital and its clinics had experienced an increase in volume of various services from 2007 to 2010. Tr. 591-92, 948-49. SRHS also opened a clinic at Cedar Lake, staffed with employed physicians, near the proposed hospital location, in an area Holland testified needed additional physician services. Tr. 593-94, 934. Testimony also demonstrated that Memorial owns over forty clinics, two of which are in Biloxi, whose physicians are aligned with the hospital and make referrals to Memorial. Tr. 981-83. As discussed below, and as the Department found, the proposed project will not have a significant impact on the current hospitals' operations. Tr. 135.

        4.        Subpart 5(d).

As to subpart 5(d), the Manual states the Department may consider

> The probable effect of the proposed facility or service on existing facilities providing similar services to those proposed will be considered. When the service area of the proposed facility or service overlaps the service area of an existing facility or service, then the effect on the existing service may be considered. The applicant or interested party must clearly present the methodologies and assumptions upon which any proposed project's impact on utilization in affected facilities or services is calculated. Also, the appropriate and efficient use of existing facilities/services may be considered.

Ex. 11. Falls testified that while there will be some discharges coming from the other hospitals,

> it will be about the same amount that was served by Gulf Coast Medical Center before it started slowing down and closed ultimately in 2008. But there is growth now in this area that actually exceeds what was going on or even projected to happen prior to Hurricane Katrina. . . . So that additional growth will ultimately eliminate any adverse impact in the near term. . . . [I]n the long term or the near term, the population growth would appear to wipe out any negative effect on the other hospitals.

Tr. 408-09. Based on the staff's review, the Department determined there would not be an

adverse impact on other area hospitals. Tr. 135. After reviewing GCMC's occupancy rate prior to closing, the occupancy rates for 2010, and the projected population increase and projected utilization, the Department concluded the reopening of the hospital would not have an adverse impact on acute care providers or residents. Tr. 135, 137. Mitchell testified that he believed the worst adverse impact would be on Biloxi Regional but that he anticipated it would remain successful since it previously competed with GCMC. Tr. 217. *See* my discussion under General Review Criterion 8 also.

5. Subpart 5(e).

As to subpart (e), the Manual states the Department may consider community reaction to the proposed facility. Ex. 11. Eicher testified the staff reviewed all the comment letters received on the Application, both for and against the project. Tr. 197-98. The Mayor of Biloxi, A. J. Holloway ("Holloway"), testified he supported the relocation of GCMC as did his constituents in Biloxi since having a hospital in Biloxi that was away from the Coast was very important for the city's medical care. Tr. 473. Holloway also testified that after the hurricane the population declined, the population was now increasing, and the proposed location was near that growth and would be a "great asset to the City of Biloxi." Tr. 473-75.

In addition, Eicher testified regarding the potential for harm to the public if the project was not approved. He testified,

> Well, at some point in the not near distant future, 60 months would pass with it not being open and operating, and that would trigger the requirement under the law that for this hospital to reopen, it would have to show a need for a new hospital. And then that would be analyzed under the existing formula that's in the Plan. The problem I see with the Coast recovery and the population growing in the future is that they would be cut off by this hospital and these number of beds and the scope of these services potentially for a very, very long period of time.

And so with that being said, there would be one hospital left in Biloxi to handle all the needs in that localized area and just a few other hospitals. It would be different if I didn't have an Applicant that says, 'We're willing to make this capital expenditure. We're willing to relocate this hospital away from storm damage and have better access, and we project reasonable utilization to get back and have a track record of utilization by the community.' So, in my sense, they are just trying to get back to where they were and then an improved situation in terms of access and further away from hazards such as hurricanes.

Tr. 179-80. Without the project[,] Eicher testified, "it would be a very long time before there could be a new hospital anywhere on the Gulf Coast," based on the Plan criteria for new hospitals so that without approval, the community would lose 144 acute beds "potentially forever." Tr. 181.

The Staff Analysis, Eicher's testimony, other evidence and testimony presented at the Hearing, and the discussions above demonstrate that the Application does comply with GR Criterion 5 and its subparts.

> D.      GR Criterion 8, *the Applicant Demonstrated It Will Not Have a Significant Adverse Impact on the Existing Providers.*

General Review Criterion 8, states the Department, as it deems appropriate, will consider the proposed project's relationship to the existing health care system. Specifically this criterion states, the Department may consider[:] "The relationship of the services proposed to be provided to the existing health care system of the area in which the services are proposed to be provided." Ex. 11.

> 1.      The Applicant Demonstrated Through Its Application and Expert Testimony that the Proposed Project Will Not Have an Adverse Impact on the Existing Providers.

In order to determine if the replacement hospital would have an adverse impact on the existing hospitals, Falls compared the service areas of the contesting hospitals on the Coast and the distance away from each hospital that a majority of a hospital's patients originate. Tr. 376,

379, 381. Using discharge data, he was able to plot the geographic epicenter of each zip code as a proxy for the location of the hospitals' patients.[3] Tr. 378; Ex. 29. While there is overlap between some of the Contestants and the proposed hospital, Falls testified overlaps were not uncommon. Tr. 383. Overlapping service areas are "fairly typical in cities that have more than one hospital that are located relatively close together. It's not at all unusual," Falls stated. Tr. 383. The Department also determined the reopening of services that previously existed would not have a negative impact on the service area since the hospital would come back into service as it previously was. Tr. 139-140. Falls agreed stating that the overlap previously existed prior to 2008 when GCMC was operating and drawing patients from the same area. Tr. 383.

Testimony at the Hearing and the Application itself demonstrated that the Applicant anticipates a substantial portion of patients at the replacement hospital will be pulled from Biloxi Regional, due to its proximity and anticipated medical staff overlap, with approximately 36% of the estimated patients at the new hospital coming from Biloxi Regional by the third year of operation. Tr. 217. 392; Ex. 2. Thus, the impact on other hospitals will average between a 10-13% reduction in volume. Tr. 392. However, given the continuing population growth in the area, the impact will be "time limited," Falls testified. Tr. 393.

2.    The Hospitals Attempted to Demonstrate a Financial Adverse Impact on Their Operations by Limiting Their Service Area to Thirteen Zip Codes.

Thomas Davidson ("Davidson"), the Contestants' expert in healthcare planning and healthcare finance, testified that the replacement hospital would have a negative impact on the other hospitals because the existing decreasing hospital utilization could not absorb the 144 beds with the current

---

[3] Luke attempted to discredit Falls' use of a zip code epicenter by presenting another map of what he thought showed the location of the population's epicenter. Tr. 1132; Ex. 62. However, Falls demonstrated on redirect that Luke used a different type of file to plot his points on Ex. 62. Tr. 1162. While the information shows "essentially the same thing," Falls testified the information he used to plot the population epicenter on his Ex. 29 could not be compared to the information Luke attempted to use because it is from two different data sources. Tr. 1162, 1164-65.

population growth. Tr. 723-24, 740. Davidson testified the hospitals could not absorb the 144 beds coming back on-line even though testimony demonstrated an improvement in finances for some of the Contestants through 2010. Tr. 942, 944-45, 987-88. And, Luke testified that the purpose of the CON law is not to protect providers. Tr. 1155-56. According to Luke, whether a non-profit makes 10 million or 10 thousand dollars does not matter as long as the hospital is able to carry out its public mission, and likewise, if a for-profit hospital can carry out its mission, the amount of money made does not matter. Tr. 1156-57.

To demonstrate the negative impact the replacement hospital would have on the contesting hospitals, Davidson analyzed the Applicant's stated primary and secondary service areas (which is comprised of only 13 zip codes) compared to the 2011 admissions by hospital. Tr. 752-55; Ex. 50. By calculating the market share for each hospital from the 13 zip codes proposed as the primary and secondary service area, Davidson showed an overlap in the service area. Tr. 755-57. After calculating the percentage market share by hospital within those 13 zip codes, Davidson used the Application's projections for patient days and admissions to calculate an "adjusted patient day." Tr. 759. (The adjusted patient day, by taking into account total patient revenues divided by inpatient revenues and multiplying that by the patient days, provides a patient day that reflects inpatient and outpatient utilization. Tr. 759.) The Application projected 32,719 patient days in year 3, which Davidson adjusted to 60,776 adjusted patient days. Tr. 759-60. Then Davidson looked at the year 3 projected patient admissions of 8,276, from the

Application, and determined only 420 admissions could be attributed to population growth, and that growth only accounted for 5.1% of the total projected admissions for the hospital in year 3. Tr. 763; Ex. 50. He then decided that left 94.9% of patient days to come from somewhere other than population growth to reach the replacement hospital's needed adjusted patient days. Tr. 763-64; Ex. 50. Taking the GCMC adjusted patient days, Davidson applied the Application's division between primary and secondary service area of 50% patients from the proposed primary service area, 45% from the proposed secondary service area, and 5% from other areas. Tr. 764; Ex. 50. He then applied his calculated market shares to the adjusted patient days for both the primary and secondary service area to determine how many adjusted patient days he thought each hospital would contribute. Tr. 765; Ex. 50. Davidson then also reviewed the potential loss of patient days by accepting that 35% of admissions would come from Biloxi Regional and concluded that some hospitals would be contributing more than others based on their market shares. Tr. 773; Ex. 50. After determining the adjusted patient days each hospital could be expected to contribute, he found the "contribution margin" for each hospital. Tr. 767. (The contribution margin is the additional revenue the hospital makes less the money that it has to spend to provide the patient day. Tr. 767.) By applying the hospital's contribution margin to the anticipated loss of adjusted patient days, Davidson calculated how much Garden Park could anticipate losing as a result of the loss of patient days to the replacement hospital. Tr. 768; Ex. 50. (Another of the Contestants' experts admitted he was unaware of any requirement that the Department calculate or utilize a methodology to calculate adverse impact. Tr. 842.) From this calculation, Davidson testified during sealed testimony that Garden Park would suffer a loss. See Tr. 771; Ex. 50. (Davidson admitted in his sealed testimony that he did not question a change in

bad debt between 2011 and 2012 or payments to Garden Park's parent company, both of which could have impacted Garden Park's projected net income.) See Tr. 801-02,895-96. Martin Brown ("Brown"), an expert in healthcare finance, testified regarding the financial impact, using the contribution margin, for Memorial, SRHS and Garden Park by using the anticipated lost adjusted patient days compared to the hospitals' 2010 net income numbers. Tr. 815, 822, 824; Ex. 52. He testified the project would have a negative adverse financial impact on SRHS and Memorial. Tr. 834.

Though the Applicant only anticipates a profit of 8.9 million a year according to the Application 's projections, according to Brown's calculations under seal, depending on what percentage of days are used, Memorial, Garden Park and SRHS would lose money.[4] See Tr. 828-32; Ex. 52. However, as explained below, Brown's and Davidson's calculations were based off of population in only 13 zip codes as opposed to the entire three coastal counties - Harrison, Hancock and Jackson. Furthermore, Brown's and Davidson's calculations were based off of 2016 population projections (the original anticipated third year of operation for the replacement hospital) though testimony demonstrated that given the CON delay, the hospital's third year of operation will more likely be 2020, a year with more population projected.

3. <u>Through the Applicant's Rebuttal Testimony It Demonstrated that the Impact to Area Hospitals when Considering the Contesting Hospitals' Appropriate Service Area Was Minimal</u>.

The Application set forth the proposed hospital's primary and secondary service area. Those

---

[4] There was also testimony at the Hearing speculating on the impact of Affordable Care Act and whether or not Mississippi would expand its Medicaid program which could have an impact on the DSH and UPL payments to all hospitals. The Contestants argued this would further decrease the hospitals' funds; however, we have yet to see the impact the federal healthcare changes will actually have on hospitals. Thus, it is inappropriate to consider the still uncertain monetary impact as a result of the federal government's rules in this state CON matter.

service areas were made up of 13 total zip codes in Harrison, Hancock and Jackson Counties, from which the Applicant expects to obtain patients. Tr. 1184-85; Ex. 2. However, the Contestants' experts took the Applicant's projected patient days, in the third year of operation, applied those to the area hospitals' 2010 patient utilization numbers to determine if there was a detrimental impact from those 13 zip codes. Tr. 1173. Not only did the Contestants compare 2010 information to projected year 3 data, the Applicant's projections were

> applied without consideration given to growth from any of the other three counties outside of the [proposed] Service Area or patients that come from outside of those three counties or . . . the remaining hospitals in the county. . . . [B]y designing it that way, you get this horrendous detrimental impact. I mean, it's maybe one of the worst detrimental impacts I've seen in over 30 years of practice. . . . But . . . when you isolate . . . only the impact of the proposed hospital without also having an assumption for growth when you've - already put the growth in the impact part of it, but you don't consider the corresponding growth anywhere else, it's a real one-sided equation, and I would expect that kind of overstatement of impact,

Falls testified. Tr. 1173-74. While Davidson's and Brown's calculated impact within **only those 13 zip codes** may be accurate, Sullivan stated that the competing hospitals looked only at growth in the projected 13 zip code service area,

> they didn't consider the growth within the broader areas that those hospitals, the three hospitals that we're focusing on, serve. . . . And so they're looking at the loss of discharges or adjusted patient days in those zip codes, but they weren't looking at growth outside of those zip codes.

Tr. 1198-99, 1206. Furthermore, the anticipated year 3 information in the Application contemplated year 3 of operation to be 2017. Tr. 1175. However, given the Contestants delay, appeal process, and design and construction process, the Applicant anticipates the third year will

Page 31 of 38

be near the middle of 2020, at a time with even more population growth projected. Tr. [5] 1175, 1178.

In order to clarify the Contestants' testimony of the anticipated negative impact, Falls utilized the Contestants' presented methodology, only changing population totals through 2020 (instead of 2017) to more accurately identify the area at the time of the anticipated third year of operation. Tr. 1176; Ex. 64. Falls maintained Davidson's and Brown's calculation of the adjusted patient days that would be corning from the other hospitals to meet GCMC's projections. Tr. 1176; Ex. 64. After taking 34% of adjusted patient days from Biloxi Regional, 40,085 patient days could be anticipated to be taken from the other hospitals. Tr. 1176; Ex. 64. Falls then took the other hospitals 2010 acute care patient days and multiplied them times the adjusted patient day factor for the remaining hospitals in the three[-]county area to reach the adjusted patient days of 359,398 in 2010. Tr. 1177; Ex. 64. The population for those three counties (371,250) when divided by the adjusted patient days gives an adjusted patient day per hospital of 0.97. Tr. 1177; Ex. 64. When the adjusted patient day per entity is compared to the anticipated population for the three counties in 2020, the total adjusted patient days are 398,570 which gives 39,172 adjusted patient days from growth between 2010 and 2020. Tr. 1177; Ex. 64. That growth, added to Biloxi Regional's adjusted patient days of 20,691, results in 59,863 patient days, subtracted from the Applicant's projected adjusted patient days leaves **only 913 adjusted** patient days to come from the other hospitals when the population of the entire three county area is considered. Tr. 1177; Ex. 64. Falls testified since 85% of the aggregate of the contesting

[5] The Contestants in their briefs took issue with Falls extending the population growth further from the date of the hearing based on the delay in construction caused by the CON contest. While this does expand the projections past a five-year period, it is not feasible that the proposed hospital's third year of operation will occur prior to that time[,] given the hearing and probable appeal.

hospitals' patients come from the three-county area, in order to determine the impact you should look at the counties instead of only the 13 zip codes of the projected primary and secondary service area. Tr. 1196. "The [projected] Service Area, wasn't constructed for purposes of determining the impact on the other hospitals but to show the relationship between the discharges at the proposed replacement hospitals and the remaining hospitals," Falls testified. Tr. 1196; Ex. 32.

By looking at the growth within the three counties from which the contesting hospitals draw patients, instead of solely focusing on the growth within the Applicant's projected 13 zip code service area, the impact to the contesting hospitals is minimal as a result of the project. Sullivan testified the contesting hospitals "have the ability to mitigate [their anticipated loss] by drawing patients from other portions of their Service Area outside of that 13 [zip] area, and there's a fair amount of population out there," as there is another 200,000 in population projected outside of the 13 zip codes. Tr. 1204. Sullivan testified,

> There's different ways to calculate impact, and that's what we've been talking about. And if you want to look at just incremental impact from one geographic area, you can do that, but then don't try to take that impact and apply it to the bottom line of the hospitals, because if you do that, then you've got to take into account that the growth comes from everywhere else. And once they took that next step, then they had to add in the growth that came from everywhere else.
>
> . . .
>
> Mr. Davidson's the one who adopted the concept that you'd take into account growth. And If you're going to take into account growth, you have to take into account growth from all the areas in which the hospitals draw patients. So the impact within the [proposed] Service Area is much larger, but the impact when you consider the growth outside the [proposed] Service Area reduces the impact [to the hospitals] within the [proposed] Service Area.

Tr. 1206, 1208. By spreading the 913 adjusted patient days out over the contesting hospitals, based on Davidson's market share percentages and Brown's contribution margins, the impact is significantly diminished. Tr. 1205; Ex. 66. Instead of the millions of dollars impact the Contestants presented, by simply accounting for the entire three county area from which the hospitals' draw patients instead of only 13 zip codes, Memorial could potentially lose $542,349, Garden Park $149,695, and SRHS $265,225 as a result of this project. Tr. 1206; Ex. 66. These potential losses also assume that the hospitals do not make any changes in their operations to account for the replacement hospital. With losses in those amounts, the resulting net income for each of the contesting hospitals remains positive and should not significantly impact the Contestants or their ability to provide indigent care. Ex. 66.

For these reasons, the Applicant complied with General Review Criterion 8.

*E. GR Criterion 9, Availability of Resources.*

General Review Criterion 9 states the Department may consider the availability of resources including health personnel and available funds for the services proposed to be provided. This Criterion includes looking at the Applicant's recruiting plan, current satisfactory staffing and alternative resources. Ex. 11.

The staff considered that prior to closing GCMC had appropriate staffing, reviewed the Applicant's plan for recruiting both physicians and healthcare personnel, and reviewed the Applicant's proposed financing source in determining the Applicant's compliance with this Criterion. Ex. 3. The Applicant stated it anticipated sharing medical staff with Biloxi Regional. Ex. 2. Further, while the Contestants attempted to argue that there was a healthcare personnel shortage, testimony and evidence demonstrated at least some of the Contestants have been adding

healthcare personnel over the last six years and that physicians frequently share call coverage. Tr. 502, 599, 601-02; Ex. 43. Thus, the Department correctly found that the Applicant complied with this Criterion.

## VII.  COMPLIANCE WITH STATE HEALTH PLAN'S GENERAL CERTIFICATE OF NEED POLICIES

In addition to the service-specific criteria and standards for the replacement of healthcare facilities without the addition of acute care beds, the Plan requires an applicant to demonstrate compliance with four general health planning priorities: (1) to improve the health of Mississippi residents (2) increase the accessibility, acceptability, continuity and quality of health services; (3) to prevent the unnecessary duplication of health resources; and (4) to provide some cost containment. In its Staff Analysis and as explained by Eicher during his testimony, the Department found that the proposed project was consistent with these four overall goals. Tr. 26; Ex. 10. Eicher testified there was no formula specified in the Plan to review these goals, instead, "every application is looked at in total, the sum total of the entire project, compliance with the Plan, and the general review criteria to determine if it's within these goals or outside these goals." Tr. 155.

*A.  The Application Does Not Propose an Unnecessary Duplication of Services.*

Regardless of the Plan's preliminary statement that a "glut" of acute care beds exists throughout the State, Eicher testified the proposed project was not an unnecessary duplication of services. Tr. 83-84. Likewise, in *CLC of Biloxi,* the Court accepted the State Health Officer's decision that bringing beds back on-line that were recognized by the State for planning purposes through a replacement/relocation was not an unnecessary duplication of services. *CLC of Biloxi,*

91 So. 3d at 637; Ex. 5. Falls also testified that putting the GCMC beds back into service with the anticipated patient utilization would not become part of a glut of beds since the replacement hospital would be operating those beds. Tr.405. To determine there was not an unnecessary duplication of services for acute beds, MRI and OB services, the staff reviewed GCMC's prior utilization, reviewed current hospital utilization, evaluated the population changes in the area, and reviewed the proposed location. Tr. 83-84, 156-58. The staff also considered the population growth in the service area in reaching its conclusion. Tr. 85.

B. *The Proposed Project Promotes Cost Containment.*

To determine that the project promoted cost containment, the staff determined that the cost associated with the project was reasonable, especially compared to a significant renovation at the same location with the likelihood of another hurricane. Tr. 86, 88. Falls echoed that thought by testifying that "ultimately, reconstructing this facility in an area that is less vulnerable to [destruction by a hurricane] is an element of cost containment." Tr. 407. Cawthon also testified that the contractor's cost estimate for construction of the replacement hospital was reasonable. Tr. 264; Ex. 20.

C. *The Proposed Project Will Improve the Health of Mississippi Residents & Increase the Accessibility, Acceptability, Continuity and Quality of Health Services.*

Falls testified that the treatment of patients in the new hospital located within the Biloxi community, where there is currently only one hospital, would improve the health of the residents. Tr.406. In addition accessibility will be increased due to the new location near 1-10, and the acceptability, continuity and quality of the facility will be improved because of the updated design and new equipment. Tr. 406.

The Department also recognized that GCMC was damaged by the Hurricane and that without any changes in the hospital's elevation or new barriers, there is a probability that another hurricane would cause damage and interrupt patient care. Tr. 38. The hospital Contestants presented testimony from various hospital employees regarding Katrina's impact on their own hospitals and their subsequent hurricane preparedness. See generally Tr. 489-94, 526-29, 552-53, 555-58, 861-63, 963-66, 997-1014; Ex. 56. Also, an expert in emergency management and preparedness from Connecticut testified regarding hurricane preparedness in general. Tr. 1025-50. However, the CON law does not consider surrounding hospitals' emergency plans. It is true that the Applicant stated both in the Application and through its witnesses that the relocation/replacement of the old GCMC further from the Gulf of Mexico would be more appropriate in the event of another hurricane. And while the Applicant also testified that the damage suffered by the existing structure would be costly to repair, especially in light of its proximity to the Gulf, the ability of the hospital Contestants to implement and exercise their own emergency preparedness plans does not influence whether or not the Application should be approved. From the Department's view, Eicher testified, moving the hospital would be a "better decision because potentially the new location could receive little or no damage . . . and may continue to operate potentially through another hurricane or other special weather event." Tr. 38. He continued by stating the

> Department would like to see any replacement along the Gulf Coast take into account the conditions that may exist on the property or location if another hurricane would occur or another special weather event. As far as the [proposed] location, I think it's part of the review of the site appropriateness, I think they did look at flood zones, flooding potential, surge area, that kind of thing. The proximity to I-10 would also help with evacuation if that would be needed and access and potentially better likelihood that the facility would be able to maintain

access to utilities and necessary transportation in and out, that kind of thing. So you know, I hate to kind of say it this way, but if you are going to relocate, the further north, the better. . . .

Tr. 39. As discussed in detail below, the proposed hospital location is in an area experiencing and projected to continue experiencing population growth. Ron Luke ("Luke"), the Contestants' expert in health planning and health economics, agreed that hospitals that seek to relocate should make capital expenditures in areas of population growth to improve access. Tr. 1072, 1155.

For these reasons, the Application meets the Plan's four goals.

## VIII. CONCLUSION AND RECOMMENDATION

Based on the substantial evidence presented at the Hearing, I find that the project proposed by Harrison HMA, LLC d/b/a Gulf Coast Medical Center is in substantial compliance with the statutes of the State of Mississippi, the requirements of the Fiscal Year 2012 Mississippi State Health Plan, the Mississippi Certificate of Need Review Manual, and all of the adopted rules, procedures and plans of the Department.

Therefore; I respectfully recommend that the CON Application for the Construction/Relocation and Replacement of Gulf Coast Medical Center to be named The Hospital at Cedar Lake together with the proposed MRI and obstetric services should be approved.

DATED this the **28** day of November.

/s/_____
Cassandra B. Walter
ADMINISTRATIVE HEARING OFFICER

Page 38 of 38

**CARLTON, J., DISSENTING:**

¶35.     I respectfully dissent, and would vacate and remand the decision of the Mississippi

Department of Health.  *See* Miss. Code Ann. § 41-7-201(f) (Supp. 2014).  My review of the

record and applicable case law reflects that the decision of the State Department of Health

is not supported by substantial evidence.[6]  The case law and the record herein reflect that the

statutory requirements applicable to establishing a new hospital apply in this case, and not

the less stringent requirements applicable to hospital relocations.  However, the evidence

fails to show that the Department of Health considered whether sufficient need existed to

support building a new hospital in Biloxi.  *See* Miss. Code Ann. § 41-7-193 (Rev. 2013).  *See*

*St. Dominic-Jackson Mem'l Hosp. v. Miss. State Dep't of Health*, 87 So. 3d 1040, 1042 (¶1)

(Miss. 2012) (finding project constituted establishing a new hospital and not a relocation and

that no need had been shown to support the capital investment required for a new hospital);

*St. Dominic-Madison Cnty. Med. Ctr. v. Madison County Med. Ctr.*, 928 So. 2d 822, 830

(¶32) (Miss. 2006).[7]

¶36.     In *St. Dominic-Jackson Mem'l Hosp*, 87 So. 3d at 1050 (¶42), the Mississippi

---

[6] A reviewing court may vacate a final order of the State Health Department regarding the issuance of a certificate of need (CON) if it finds that the final order is not supported by substantial evidence, or is contrary to the manifest weight of the evidence.  *Singing River Hosp. Sys. v. Biloxi Reg'l Medical Center*, 928 So. 2d 810, 811-12 (¶4) (Miss. 2006); Miss. Code Ann. § 41-7-201(f).  When reviewing the Department of Health's issuance of a CON to a hospital, the appellate court must consider the substance of the proposal rather than its label.  *Singing River Hosp. Sys*. at 812 (¶8).

[7] *See also St. Dominic–Jackson Memorial Hospital v. Miss. State Dep't of Health*, 728 So. 2d 81, 85 (¶13) (Miss. 1998) (finding that a medical center's proposed relocation of sixty-four beds to a new satellite campus actually constituted the establishment of a new hospital and not merely a relocation, and thus required a showing of need for a new hospital in that location).

23

Supreme Court recently found that an attempt by St. Dominic Hospital to relocate seventy-one existing beds from Jackson to a new satellite campus in Madison constituted the establishment of a new hospital, and not a relocation of the beds to an existing licensed facility. Similarly, in the instant case, the relicensed beds are not being relocated to an existing facility, but, rather, are being used to establish the bed capacity at a new hospital facility without a determination of need for the capital investment of a new hospital in that area or of any unnecessary duplication of services. Therefore, in this case, in accordance with precedent, the decision of the Department of Health lacks sufficient basis and should be vacated and remanded, since no evidence shows consideration of need for a new hospital.[8]

¶37. The supreme court has provided that when reviewing the State Department of Health's issuance of a CON to a hospital, the reviewing court must consider the substance of the proposal, rather than simply its label. *See* Miss. Code Ann. § 41-7-201(f); *Singing River Hosp. Sys. v. Biloxi Reg'l Med. Ctr.*, 928 So. 2d 810, 812 (¶8) (Miss. 2006). Despite its label, a review of the record shows that this case fails to show a mere reopening of a hospital that ceased to operate for less than sixty months, as is allowed by Mississippi Code Annotated section 41-7-191(1)(a) (Rev. 2013), and the evidence fails to support any finding that this project constitutes the relocation of an existing facility involving no capital expenditures, as allowed by section 41-7-191(b). Section 41-7-191(c) permits voluntary

---

[8] *See St. Dominic-Jackson Mem'l Hosp.*, 728 So. 2d at 91-92 (¶¶39-42) (distinguishing between relocation and establishment of a new facility) (citing *Ex Parte Shelby Medical Center, Inc.*, 564 So. 2d 63 (Ala. 1990) (providing that a determination of need for a new hospital is required to determine if sufficient need exists to support the capital expenditure required to establish a new hospital and to comply with the state's health plan)).

delicensed beds to be relicensed by a health-care facility to increase the number of its licensed beds. However, in this case, the relicensed beds are not being added to any existing licensed beds at any existing licensed medical facility. This statutory authorization to relicense beds contemplates on its face the addition of the relicensed beds to an existing licensed medical facility.[9] The statutory power to relicense beds in order to increase the number of licensed beds provides no authorization for the capital investment, construction, and establishment of a new health-care facility in a new location. *See* Miss. Code Ann. § 41-7-191(1)(c).

¶38.    In the case relied upon by the majority, *Queen City Nursing Center, Inc. v. Mississippi State Department of Health*, 80 So. 3d 73, 75-76 (¶2) (Miss. 2011), the opinion shows that beds from a closed facility were added to a "then-existing" licensed facility in Lauderdale County and that the then-existing facility was relocated within that same county, with additional bed capacity. The opinion reflects that there was evidence of an existing need in Lauderdale County for the existing licensed facility and the expansion of beds to that existing licensed facility. *Id*. at 80 (¶14). The opinion also reflects that economies of scale were realized by combining the beds of the closed facility with the existing facility. *Id*. at 82 (¶22).

¶39.    In this case, in contrast to *Queen City Nursing Center*, HMA has no existing "licensed" health-care facility in Biloxi to which it seeks to add the relicensed beds from the closed hospital. Rather, HMA seeks to build a new hospital in Biloxi with bed capacity from

---

[9] *See* Miss. Code Ann. § 41-7-191(c) (relicensed beds may increase number of licensed beds).

25

the closed hospital. The relicensed beds herein are not increasing the number of existing licensed beds at an existing licensed medical facility, as authorized by section 41-7-191(c). Instead, HMA's project requires a large capital investment to build a new hospital facility to provide additional hospital services in that area, to be built at a new location in Biloxi with relicensed beds from a closed hospital, without a determination of whether need exists to support such.

¶40. The CON criterion seeks to improve the health of Mississippi residents; to increase accessibility, acceptability, and continuity of care and quality of care; to prevent unnecessary duplication; and to provide cost containment. Unnecessary duplication of capital investment and medical services could result in excessive costs to the state and to patients.[10] The beds from the closed hospital herein are not being added to an existing licensed hospital, and no evidence shows that the establishment of a new hospital could contain costs, could prevent unnecessary duplication of services, or could be economically viable.[11] In the *Queen City Nursing Center* opinion, as acknowledged, the record showed an existing licensed nursing home in Lauderdale County was meeting an existing and increasing need in that area. By contrast, in this case, the record contains no evidence of consideration of the CON criterion or of need, economic viability, or cost containment analysis for the large capital investment

---

[10] *See Miss. State Dep't of Health v. Mid-S. Assocs*., 25 So. 3d 358, 364 (¶21) (Miss. Ct. App. 2009); *see also* Miss. Code Ann. § 41-7-193 (certificate of need for new institutional health service).

[11] This case differs from *CLC of Biloxi LLC v. Miss. Dep't of Health*, 91 So. 3d 633, 638-39 (¶17) (Miss. 2012), wherein a nursing home was destroyed by a hurricane. The supreme court found that the destroyed nursing home needed no new CON to rebuild since substantial evidence in the record supported the finding of need for the nursing home services in the area of the proposed location.

of a new hospital in Biloxi.[12]  Based on upon the foregoing, I respectfully dissent, since the record contains no evidence that the Department of Health evaluated the applicable criterion for the building of a new hospital.  Since the decision and order of the Department of Health lacks applicable evidentiary support, I would vacate and remand the order to the Department of Health for further proceedings consistent with this dissent, and with instructions for the Department of Health to evaluate need and applicable criteria for establishing a new hospital in Biloxi.  *See* Miss. Code Ann. § 41-7-201(f); *see also* Miss. Code Ann. § 41-7-191(1)(c).

---

[12] *St. Dominic-Madison Cnty. Med. Ctr.*, 928 So. 2d at 830 (¶32) (An application for a CON filed by hospital that had a licensed capacity of 571 beds and wanted to relocate 100 beds sought a new hospital, and not a relocation, and, thus, in light of hospital's admitted inability to meet the standards of need for a new hospital, there was no need to remand case for further review by the Department of Health.).